Thomas G. BUTLER, Mary J. Butler,
Steven J. Grundahl, Nancy J. Grundahl,
James A. Gallop, Maureen Gallop, Greg Kittelsen,
Edith Kittelsen, Duane Schwartz, Joan Schwartz,
Dewey Mullikin, Juanita Mullikin, Helen Brekke,
Phillip Jones, Susan Jones, Allen Hall,
Florence Hall, Michael Singer, Noel Singer,
H. James Jacobsen, Debby Jacobsen, Scott Blanck,
Dana Blanck, Larry Kinney and Karen Kinney,
Plaintiffs-Appellants-Petitioners,

Albert KEMPF, Pat Kempf, Dale E. Johnson,
Joan L. Johnson, Harold M. Flolid,
Karen A. Flolid, Carolyn Ousdigian,
Ted Ousdigian, Jeremy Ferris, June Ferris,
Suzanne Meland, Michael T. Meland, Estate of
Maxine Lenz, Daryl Erdman, Audrey Erdman,
Lawrence J. Jarvela, Patricia D. Jarvela, Joann
Yohn, Stephen Yohn, Jerry Greeley, Karen Greeley,
Niel R. Petersen, Marlys J. Petersen, Karen Ek,
Bill Ek, Charles Peterson, Douglas J. Gallop,
Shirley Gallop, Mike Evavold, Mark R. Parks,
Art Kosieradzki, Jeanne Kosieradzki,
Gary C. Boyum, Eleanor Kay Boyum,
Beverly Gallop and Bud Gallop,
Intervening-Plaintiffs-Appellants-Petitioners,

Thomas E. FERRIS and Joy Linda Ferris,
Intervening-Plaintiffs,

v.

397

ADVANCED DRAINAGE SYSTEMS, INC.,
Daniel Kling and ECG, Inc.,
Defendants-Respondents,

CITY OF SHELL LAKE,
Defendant,

CINCINNATI INSURANCE COMPANY
and Gulf Underwriters Insurance Company,
Intervening-Defendants-Respondents,

BOB THOMPSON & SONS and
Thompson Sand & Gravel,
Defendants-Third-Party Plaintiffs-Respondents,

v.

HOFFMAN CONSTRUCTION COMPANY
and Wausau Insurance Companies,
Third-Party Defendants-Respondents.

Supreme Court

*No. 2004AP1991. Oral argument January 12, 2006.
—Decided July 13, 2006.*

2006 WI 102

(Also reported in 717 N.W.2d 760.)

400

401

For the plaintiffs-appellants-petitioners and the intervening plaintiffs-appellants-petitioners, there were briefs by *Steven B. Goff, Tracy N. Tool,* and *Bye, Goff &*

*Rohde, Ltd.,* River Falls; *Matthew A. Biegert, Michael J. Brose,* and *Doar, Drill & Skow, S.C.,* New Richmond, and oral argument by *Matthew A. Biegert.*

For the defendants-third-party plaintiffs-respondents and the third-party defendants-respondents, there was a brief by *Patrick H. O'Neill, Jr.* and *O'Neill & Murphy, LLP,* Saint Paul, MN; *J. David Rice* and *Rice, Heitman & Davis, S.C.,* Sparta; *Timothy J. Muldowney* and *LaFollette Godfrey & Kahn,* Madison, and oral argument by *J. David Rice.*

For the defendants-respondents, Daniel Kling and ECG, Inc., there was a brief by *Thomas J. Graham, Jr., Christine A. Gimber,* and *Weld, Riley, Prenn & Ricci, S.C.,* Eau Claire.

For the defendant-respondent, Advanced Drainage Systems, Inc., there was a brief by *William J. Katt, Mark D. Malloy,* and *Leib & Katt, S.C.,* Milwaukee.

For the intervening defendant-respondent, Gulf Underwriters Insurance Company, there was a brief by *Mark Rattan, James P. Odda,* and *Litchfield Cavo LLP,* Brookfield.

An amicus curiae brief was filed by *Daniel D. Barker, James K. Pease, Jr., Jack D. Walker, Philip J. Bradbury,* and *Melli, Walker, Pease & Ruhly, S.C.,* Madison, on behalf of Associated Builders & Contractors of Wisconsin, Inc., AGC of Wisconsin, Inc., and Wisconsin Transportation Builders Association.

¶ 1. PATIENCE DRAKE ROGGENSACK, J. The circuit court granted summary judgment of dismissal to the defendants on the plaintiffs' negligence and nuisance claims.[1] The court of appeals affirmed. Because we conclude that the plaintiffs' negligence and nuisance

---

[1] Judge Norman L. Yackel presided in the Washburn County Circuit Court.

claims are precluded by public policy and were properly dismissed, we affirm the court of appeals, albeit on different grounds than those employed by the court of appeals.

## I. BACKGROUND

¶ 2. This action arises out of a project to design and install a system to lower the water level (the Project) of Shell Lake (the Lake). The Lake is a bowl-shaped lake, covering approximately 2500 acres. It is located entirely within the boundaries of the City of Shell Lake, Wisconsin (the City). There are more than 400 properties abutting the Lake. The plaintiffs and intervening plaintiffs (collectively, plaintiffs) own properties on the Lake.

¶ 3. The surface water elevation of the Lake has fluctuated significantly over the past century. In the most recent several decades, the water level of the Lake has been rising. As a result, in 1977, the City entered into an agreement with the Wisconsin Department of Natural Resources (DNR) to raise the ordinary high water mark of the Lake. This agreement was developed to aid the City with adoption and administration of a shoreland zoning ordinance, with the understanding that a surface water drain would be installed in order to maintain the water level at or below the ordinary high water mark set by the DNR.

¶ 4. In the meantime, property development surrounding the Lake continued. The water level continued to rise. In 1987–1988, the U.S. Army Corps of Engineers conducted an investigation of the problem and issued a report that suggested plans for water diversion and associated costs. The report showed that the water level had risen in the 1980s and 1990s, and predicted that the water level would continue to rise. It

noted a drop in water level from 1986–1987 due to record low precipitation, but it noted:

> Realizing the potential for flooding of their properties, area residents continue to be concerned despite the fact that the lake level has dropped during the past year. Accordingly, city officials continue to express a need for the development of measures to alleviate the flooding problem.

U.S. Army Corps of Engineers, *Reconnaissance Report, Flood Control* section 205 at 11 (March 1988 draft).

¶ 5. The 1988 report ultimately concluded:

> The level of Shell Lake is presently down from the [] high level of elevation 1221.99 feet msl reached in 1986. However, historical accounts indicate that the lake has the potential for rising to much higher levels. With the return of normal precipitation or precipitation at levels experienced during the period 1977–1986, rising lake levels can once again be expected. Any appreciable rise in the lake level above the high recorded in 1986 could result in catastrophic losses to existing developments.

*Id.* at 29.

¶ 6. The water level appeared to stabilize in the years immediately following the Army Corps of Engineers report, and plans to install a drain were put on hold. By 1994, the surface water drain that was to have been installed as a result of the 1977 agreement between the DNR and the City was not in place. The DNR investigations of the water level determined that the ordinary high water mark, based on erosion and analyses of vegetation changes, had risen again. Accordingly, the DNR declared an even higher ordinary high water mark. The DNR's report noted that a substantial amount of

development had occurred on the Lake in low areas, with much of the development occurring below the 100–year floodplain boundary.

¶ 7. In 1997, after the water level had reached 1222.24 feet, mean sea level (msl), then a record high, the City petitioned the DNR to divert water into Sawyer Creek. However, the DNR denied the City's permit application because of the expected negative ecological effects the proposed plan would have on Sawyer Creek.

¶ 8. In 2000, the City met with the DNR staff to review several new options for water diversion. In 2001, the City applied to the DNR for a new permit, this time to divert lake water into the Yellow River. The Project involved placing structures on the bed of the Lake and in the Yellow River that would facilitate the diversion. The Project also called for the construction and installation of drainage pipe along an approximately 4.5 mile route from the Lake to the Yellow River. The intent of the Project was to maintain the Lake near the ordinary high water mark set in 1994. The DNR granted the City's petition for the Project. The estimated cost exceeded $1,600,000. The City intended to fund the project, in part, through $650,000 of special assessments on riparian property owners. In the meantime, emergency pumping was undertaken to temporarily lower the water level.

¶ 9. The City contracted with engineer Daniel Kling (Kling) and his company, Envirosystems Consulting Group, Inc. (Envirosystems), for design and engineering; with Advanced Drainage Systems, Inc. (Advanced Drainage) for the supply of pipes; and with Bob Thompson & Sons and Thompson Sand & Gravel (Thompson) for installation and general contractor services.

¶ 10. Envirosystems created the plans and specifications for the Project. The plans called for 24,000 feet of light-weight high-density polyethylene pipe rated to

withstand 10.8 pounds per square inch (psi) of pressure. Other types of high-density pipe that could withstand more pressure were considered, but ultimately were rejected.

¶ 11. The Project construction proceeded in the late summer and fall of 2002 when the water level ranged between 1223.91 and 1224.44 feet msl.[2] When the pipeline opened for the first time in November 2002, leaks immediately developed and it was shut down for repair. Subsequently, Advanced Drainage found that gaskets on the pipeline had been displaced and that dirt and debris had entered the pipeline. Six attempts were made at a minimum flow rate, and all failed. From November of 2002 to June of 2003, Envirosystems, Advanced Drainage, and Thompson attempted to repair the pipeline.

¶ 12. While the attempted repair was underway, the City hired an engineering firm to investigate the Project and to propose solutions. The resulting report concluded that the pipeline's failure stemmed from design and material defects, failure to test the materials and problems with installation. The report suggested several alternative solutions to appropriately accommodate the water pressure, including reconstruction of the pipeline, the use of new types of piping made of different materials, and the insertion of a "slip-line" within the existing pipe.

¶ 13. The City ultimately chose to insert a slip-line of solid wall 80 psi pipe. By March 2004, after the new system of pipe had been in place and functioning for several months, the water level had receded to 1222.18 feet msl.

---

[2] According to the Army Corps of Engineers Report, the highest recorded water level was 1228.55 feet msl in 1900.

¶ 14. A group of riparian property owners filed this action. They sued the City, Envirosystems, Advanced Drainage, Thompson, and their insurers.[3] They alleged the following claims for relief that are before us on this appeal:[4] (1) Advanced Drainage, Kling, Envirosystems, Thompson, and the City were negligent in performing their contractual obligations for the Project, causing property damage, loss of property value and loss of enjoyment; and (2) the defendants' negligent actions and inactions created and maintained a nuisance, which nuisance unreasonably impaired the plaintiffs' right of enjoyment and right of reasonable use of their property.

¶ 15. The plaintiffs moved for class certification, pursuant to Wis. Stat. § 803.08, and the defendants moved to change venue, pursuant to Wis. Stat. § 801.52. On October 14, 2003, the circuit court denied the request to certify and changed the venue to Burnett County. It also dismissed the City from the lawsuit.[5] Subsequently, the remaining defendants moved for summary judgment, pursuant to Wis. Stat. § 802.08. The circuit court granted their motion and dismissed the lawsuit.

¶ 16. The court of appeals affirmed the circuit court. *Butler v. Advanced Drainage Sys., Inc.*, 2005 WI App 108, ¶ 2, 282 Wis. 2d 776, 698 N.W.2d 117. It declined to address the issues of class certification and venue change. *Id.*, n.1. In reaching its decision, the court of appeals concluded that Restatement (Second) of Torts

---

[3] Cincinnati Insurance Company and Gulf Underwriters Insurance Company are named as intervening defendants.

[4] The complaint also asserted an inverse condemnation claim and claims for declaratory and injunctive relief, which are not before us.

[5] The decision to dismiss all claims against the City has not been appealed.

§ 324A (1965) was the framework for analyzing the plaintiffs' negligence claims.[6] *Id.,* ¶ 22. It concluded that summary judgment was appropriate because, based on the undisputed facts, "none of the three alternative conditions for liability under § 324A [had] been met." *Id.,* ¶ 2. The court of appeals also concluded that an action based on nuisance should be dismissed because it was based on allegedly negligent conduct and the defendants' conduct is not "otherwise actionable under the rules governing liability for negligent conduct." *Id.,* ¶¶ 40–41 (citing *Milwaukee Metro. Sewerage Dist. v. City of Milwaukee,* 2005 WI 8, ¶ 63, 277 Wis. 2d 635, 691 N.W.2d 658). The plaintiffs petitioned for review of the court of appeals decision and we granted their petition.

## II. DISCUSSION

A. Standard of Review

¶ 17. This case requires us to review summary judgment dismissing the plaintiffs' claims against the defendants. Whether summary judgment was properly

---

[6] Restatement (Second) of Torts § 324A (1965) provides;

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

granted is a question of law. *Fortier v. Flambeau Plastics Co.*, 164 Wis. 2d 639, 651–52, 476 N.W.2d 593 (Ct. App. 1991). We independently review a grant or denial of summary judgment, applying the same methodology as the circuit court, although benefiting from the opinions of both the circuit court and the court of appeals. *See Cole v. Hubanks*, 2004 WI 74, ¶ 5, 272 Wis. 2d 539, 681 N.W.2d 147. Whether public policy precludes liability based on a negligence claim is also a question of law. *Gritzner v. Michael R.*, 2000 WI 68, ¶ 27, 235 Wis. 2d 781, 611 N.W.2d 906.

B. Summary Judgment Principles

¶ 18. Every decision on a motion for summary judgment begins with a review of the complaint to determine whether, on its face, it states a claim for relief. *Hoida, Inc. v. M&I Midstate Bank*, 2006 WI 69, ¶ 16, 291 Wis.2d 283, 717 N.W.2d 17 (citing *Westphal v. Farmers Ins. Exch.*, 2003 WI App 170, ¶ 9, 266 Wis. 2d 569, 669 N.W.2d 166). If it does, we examine the answer to see if issues of fact or law have been joined. *Hoida*, 291 Wis.2d 283, ¶ 16. After we have concluded that the complaint and answer are sufficient to join issue, we examine the moving party's affidavits to determine whether they establish a prima facie case for summary judgment. *Id.* When they do so, we review the opposing party's affidavits to determine whether there are any material facts in dispute, or inferences from undisputed material facts, that would entitle the opposing party to a trial. *Id.* "We will affirm a grant of summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Baumeister v. Automated Prods., Inc.*, 2004 WI 148, ¶ 11, 277 Wis. 2d 21, 690 N.W.2d 1. "[T]he mere

411

existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," so long as there is no disputed fact that is material to the claim or defense made. *Id.* (quoting *City of Elkhorn v. 211 Centralia Corp.*, 2004 WI App 139, ¶ 18, 275 Wis. 2d 584, 685 N.W.2d 874).

## C. Public Policy Factors

¶ 19. When liability for negligence is established, we may preclude liability based on public policy factors. *Coffey v. City of Milwaukee*, 74 Wis. 2d 526, 541, 247 N.W.2d 132 (1976). We do so as a matter of law. *See Alvarado v. Sersch*, 2003 WI 55, ¶¶ 16–17, 262 Wis. 2d 74, 662 N.W.2d 350 (citing *Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis. 2d 627, 644, 517 N.W.2d 432 (1994); *A.E. Inv. Corp. v. Link Builders*, 62 Wis. 2d 479, 484–85, 214 N.W.2d 764 (1974)). The six public policy factors we have employed are: "(1) [t]he injury is too remote from the negligence; . . . (2) the injury is too wholly out of proportion to the culpability of the negligent tortfeasor; . . . (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; . . . (4) . . . allowance of recovery would place too unreasonable a burden on the negligent tortfeasor; . . . (5) [to allow recovery] would open the way for fraudulent claims; or (6) [to allow recovery] would enter a field that has no sensible or just stopping point." *Coffey*, 74 Wis. 2d at 541.

¶ 20. We have cautioned against applying public policy factors to preclude liability where the facts are too complicated and warrant development of the factual

basis for the negligence claim. *Alvarado,* 262 Wis. 2d 74, ¶¶ 18, 20–26 (citations omitted). However, we have also said that a reviewing court may preclude liability even when liability for negligent conduct has not been fully developed, e.g., on a motion to dismiss for failure to state a claim. *Stephenson v. Universal Metrics, Inc.,* 2002 WI 30, ¶ 42, 251 Wis. 2d 171, 641 N.W.2d 158 (citing *Miller v. Wal-Mart Stores,* 219 Wis. 2d 250, 265, 580 N.W.2d 233 (1998)); *see also Coffey,* 74 Wis. 2d at 541–42. When we do so, we assume for purposes of our decision that the defendant is liable for negligent conduct, "but for reasons of public policy, we prevent the claim from proceeding." *Cole,* 272 Wis. 2d 539, ¶ 7 (citing *Gould v. Am. Family Mut. Ins. Co.,* 198 Wis. 2d 450, 460, 543 N.W.2d 282 (1996)); *see also Smaxwell v. Bayard,* 2004 WI 101, ¶ 39, 274 Wis. 2d 278, 682 N.W.2d 923; *Gritzner,* 235 Wis. 2d 781, ¶ 26.

## D. Public Policy Application

¶ 21. Here, the complaint states a claim for relief and the answer joins issue. The relevant facts relating to the attempted water abatement are not disputed. They show that the City contracted with the defendants to lower the water level in the Lake and that the defendants' efforts were not successful. Therefore, we conclude that the facts of record are sufficiently developed for us to undertake a public policy analysis. When we do so, "we assume there is negligence and that the negligence was a cause of the injury, but for reasons of public policy, we prevent the claim from proceeding."[7] *Cole,* 272 Wis. 2d 539, ¶ 7.

---

[7] The dissent takes issue with applying a public policy analysis when causation and damages remain. Dissent, ¶ 84.

¶ 22. Although several of the six public policy factors could apply in this case, the sixth public policy factor, that imposing liability would enter a field that has no sensible or just stopping point, is the factor that compels us to preclude liability. *Rockweit v. Senecal,* 197 Wis. 2d 409, 541 N.W.2d 742 (1995), provides a framework for our discussion.

¶ 23. In *Rockweit,* we determined, based on public policy, that a friend who visited a family around a campfire and was the last to leave the campfire could not be held liable for injuries sustained by a young child, who later fell into the un-extinguished fire's hot coals. In explaining our decision, we noted that the child's injuries could have occurred in exactly the same manner even if the friend had not been present at the campground. *Id.* at 428. We also noted that the child's parents were aware of the open hazard the fire's coals presented, yet they had not secured the child's safety. *Id.* We concluded that if liability could be imposed on the visiting friend for failing to extinguish the campfire, there would be no sensible or just stopping point as to whom could be held liable for a known hazard. *Id.* at 428–29. We noted the appropriateness of the question asked by the court of appeals:

> . . . [W]hen it comes to fires . . . is it the last adult to leave, the last person to put a log in the fire? Or is it the owner of the campsite? Or the person who started the campfire?

*Id.* at 428.

---

However, because we assume negligence, cause and injury, determining whether there is cause and damages is not necessary to a public policy analysis. *Smaxwell v. Bayard,* 2004 WI 101, ¶ 39, 274 Wis. 2d 278, 682 N.W.2d 923.

¶ 24. The principles of *Rockweit* are similar to those we employ to preclude the defendants' liability in this case. For example, the natural hazard, flooding caused by the rising water level of the Lake, has been known for decades. Just as the plaintiffs in *Rockweit* were aware of the fire hazard, the plaintiffs in this case were aware of the flooding hazard surrounding the Lake; yet they continued to place themselves in harm's way, often by building dwellings below the 100–year floodplain for the Lake. When the potential for damage from the Lake's flooding was known and of an ongoing nature, should an unsatisfactory abatement effort serve as the source of recoverable damages? Just as we determined in our public policy analysis in *Rockweit,* it is probable that absent any act by the defendants, the plaintiffs, nevertheless, would have suffered damages.

¶ 25. If we were to permit liability against the defendants before us, we would be opening the door to property owners' claims against any contractor who contracts with a municipality to remediate a naturally occurring hazard, when the contractor fails to completely abate the hazard's effects. This broad exposure to liability would chill municipalities' efforts in attempting abatement projects. It could also chill contractors from bidding on those types of municipal projects; where in addition to being subject to a breach of contract action by the municipality[8] for not performing as they had contracted to perform, the contractors would be subject to litigation by any property owner who would have benefited from a successfully performed municipal contract.

---

[8] Here, the contractors were sued by the City for breach of contract, and the suit was settled to the satisfaction of the City of Shell Lake. Therefore, the contractors have not escaped liability for failing to create and install a system to lower the water level in the Lake.

¶ 26. Furthermore, permitting this claim to go forward could encourage lawsuits for any number of potentially negligent participants who have tried unsuccessfully to prevent flooding, over the long history of the Lake's rising water levels. This is a natural hazard that was amplified by development on the Lake. Should every failed effort at controlling the flooding bring a lawsuit? For example, if a retaining wall had been constructed in the hope of holding off rising water and the property flooded nevertheless, should that contractor also be held responsible for the damage to the plaintiff's or to neighboring residents' properties because the efforts were unsuccessful?

¶ 27. As in *Rockweit,* we conclude that to open the door for this type of claim would be to enter a field with no just or sensible stopping point. Therefore, we conclude that the defendants may not be held liable for their unsatisfactory abatement efforts and the dismissal of the plaintiffs' negligence claim was proper.

E. Nuisance

¶ 28. The plaintiffs also bring a nuisance claim against the defendants. "Liability for a nuisance may be based upon either intentional or negligent conduct" and may be grounded in either creating or maintaining a nuisance. *Milwaukee Metro,* 277 Wis. 2d 635, ¶ 33. "Nuisances come in two varieties, public and private, which are distinguished by the nature of the interest invaded." *Id.,* ¶ 27. A private nuisance involves interference with or disturbance of the use and enjoyment of an individual's land. *Id.* Those who have property rights or privileges with regard to the use or enjoyment of land impacted by a nuisance may maintain a claim for

private nuisance. *Id.* "A public nuisance is an unreasonable interference with a right common to the general public," and does not necessarily involve the interference with the use or enjoyment of land. *Id.,* ¶ 28 (citations omitted). "In sum, a nuisance exists if there is a condition or activity that unduly interferes with the private use and enjoyment of land or a public right." *Id.,* ¶ 30.

¶ 29. When we review an alleged nuisance claim, our first step is to determine whether nuisance exists. *Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.,* 2002 WI 80, ¶ 27, 254 Wis. 2d 77, 646 N.W.2d 777. Nuisance arises when a particular type of harm is suffered, i.e., nuisance refers to the particular interest that is invaded. *Milwaukee Metro,* 277 Wis. 2d 635, ¶¶ 25–26. If nuisance is present, our second step is to determine whether the complained of conduct was a cause of creating the nuisance. *Id.,* ¶ 64. Proof that the underlying conduct was tortious is necessary to liability predicated on nuisance. *Id.,* ¶ 32. If the underlying conduct is not a cause of the nuisance, no claim for relief will stand. *Id.* As the third step, we decide whether the "defendant's conduct is otherwise actionable under the rules governing liability for negligent conduct." *Id.,* ¶ 63.

¶ 30. The plaintiffs' complaint does not label their claim as one for a private or a public nuisance. However, it does refer to the use and enjoyment of their private property, implying that it is a private nuisance claim. The plaintiffs use the same conduct as the basis for their nuisance claim, as they employed for their negligence claim. When a nuisance claim is predicated on negligent acts, it is necessary for the court to separately analyze the nuisance claim for relief from the negli-

gence claim for relief. *See id.,* ¶ 45. We have analyzed the plaintiffs' negligence claim above.

¶ 31. In *Physicians Plus,* we held that due to the analogous relationship between negligence and nuisance, liability for maintaining a public nuisance can be limited on public policy grounds traditionally used to preclude liability for general negligence claims. *Physicians Plus,* 254 Wis. 2d 77, ¶ 2. Although *Physicians Plus* addressed a public nuisance, we have held that the *Physicians Plus* reasoning applies to claims of private nuisance as well:

> Since all the underlying rules of negligence are applicable to a claim of nuisance based on negligence, logically then, the prerequisites for liability should not vary depending upon whether the interest invaded by the defendant's negligent conduct is public or private.

*Milwaukee Metro,* 277 Wis. 2d 635, ¶ 47 (citations omitted). We further explained, citing our prior ruling in *Schiro v. Oriental Realty Co.,* 272 Wis. 537, 76 N.W.2d 335 (1956), that "when a nuisance is premised on negligent conduct, failing to allow [a] defendant the same defenses as he would have in a negligence action would render liability dependent on the label the plaintiff used on the pleading and not the defendant's underlying conduct." *Milwaukee Metro,* 277 Wis. 2d 635, ¶ 48.

¶ 32. The plaintiffs assume the existence of a nuisance when they claim that the use and enjoyment of their property is invaded by the flooding waters of the Lake. They also assert that a cause of this invasion is the defendants' unsuccessful abatement actions. However, there is no dispute that the defendants did nothing to cause the Lake's rising water level; the plaintiffs claim against the defendants because they did not succeed in causing the water level to recede. There-

418

fore, it is the defendants' unsatisfactory abatement efforts that the plaintiffs assert as a cause of the nuisance.

¶ 33. We have explained that cause-in-fact (a substantial factor) and the public policy factors are both used when we determine liability. *Fandrey v. Am. Family Mut. Ins. Co.,* 2004 WI 62, ¶ 14, 272 Wis. 2d 46, 680 N.W.2d 345.

> Even though a jury has found negligence and that such negligence was a "cause" (or substantial factor) in producing a plaintiff's damages, liability may be denied under factors that we have termed public policy considerations.

*Id.* (quoting *Beacon Bowl, Inc. v. Wis. Elec. Power Co.,* 176 Wis. 2d 740, 761, 501 N.W.2d 788 (1993)).

¶ 34. We have concluded, as a matter of law, that the plaintiffs' negligence claim should not go forward because to permit the claim would enter a field with no just or reasonable stopping point. When we did so, we were deciding that as a matter of law, the defendants' actions were not sufficient to support liability for the plaintiffs' damage. *See Fandrey,* 272 Wis. 2d 46, ¶¶ 30–34. The plaintiffs' nuisance claim is based on the same allegedly negligent abatement of the flooding around the Lake. Therefore, according to the principles set forth in *Physicians Plus* and *Milwaukee Metro,* we conclude that even if we assume, arguendo, that the plaintiffs were able to prove all of their allegations with regard to the private nuisance claim, it is appropriate to preclude liability for the nuisance claim based on the same public policy factors that limit liability in the underlying negligence claim. Were we not to do so, we would cause the potential for liability to be tied to the label the plaintiffs applied to each claim. Permitting the

nuisance claim to proceed would also be inconsistent with the public policy factors on which we have limited liability.

¶ 35. Accordingly, we conclude that the court of appeals correctly affirmed the circuit court's grant of summary judgment in favor of the defendants, although we base our holding on different reasoning than the court of appeals employed.

## III. CONCLUSION

¶ 36. We conclude that the plaintiffs' negligence and nuisance claims are precluded by public policy, and were properly dismissed. Therefore, we affirm the court of appeals, albeit on different grounds than that employed by the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 37. PATIENCE DRAKE ROGGENSACK, J. (*concurring*). The majority opinion, which I authored and join, affirms the court of appeals decision that in turn affirmed the circuit court's grant of summary judgment dismissing plaintiffs' claims. The court of appeals based its decision on the application of Restatement (Second) of Torts § 324A (1965), after concluding that § 324A is the appropriate framework for analyzing the plaintiffs' negligence claims. *Butler v. Advanced Drainage Sys., Inc.,* 2005 WI App 108, ¶ 22, 282 Wis. 2d 776, 698 N.W.2d 117.

¶ 38. The majority has chosen to deny liability based on a public policy factor. When we employ public policy factors to preclude liability, we engage in judicial line-drawing wherein we conclude there is the lack of sufficient cause to hold a defendant liable. *Fandrey v.*

*Am. Family Mut. Ins. Co.,* 2004 WI 62, ¶ 16, 272 Wis. 2d 46, 680 N.W.2d 345. In so doing, we employ a case-by-case analysis that provides little guidance for the courts, future litigants, or the public who may face similar legal issues in the future. I write separately because analyzing the plaintiffs' claims under Restatement (Second) of Torts § 324A would have provided more guidance to those who assert or defend a tort claim based on the breach of a contract to which the plaintiff was not a party. Accordingly, I respectfully concur in the majority opinion affirming the court of appeals.

## I. BACKGROUND

¶ 39. The court of appeals concluded that the Restatement (Second) of Torts § 324A was the appropriate framework for analyzing the plaintiffs' negligence claims. *Butler,* 282 Wis. 2d 776, ¶ 22. It concluded that summary judgment was appropriate because, based on the undisputed facts, "none of the three alternative conditions for liability under § 324A [had] been met." *Id.,* ¶ 2. The court of appeals also concluded that an action based on nuisance should be dismissed because it was based on allegedly negligent conduct and the defendants' conduct is not "otherwise actionable under the rules governing liability for negligent conduct." *Id.,* ¶ 40 (quoting *Milwaukee Metro. Sewerage Dist. v. City of Milwaukee,* 2005 WI 8, ¶ 63, 277 Wis. 2d 635, 691 N.W.2d 658).

## II. DISCUSSION

A. Standard of Review

¶ 40. This case requires us to review summary judgment dismissing the plaintiffs' claims against the

defendants. The standard of review in regard to summary judgment decisions is fully set forth in the majority op., majority op., ¶ 17, as are the principles that we apply in deciding whether summary judgment should have been granted, majority op., ¶ 18.

## B. The Negligence Claim

¶ 41. The plaintiffs' negligence claim can be analyzed within the framework set out in the Restatement (Second) of Torts § 324A or under the usual four-element negligence test. The court of appeals relied on § 324A, and the circuit court applied the four-element test. I conclude that the test set out in § 324A provides the better framework.

## 1. Restatement (Second) of Torts § 324A

¶ 42. The court of appeals concluded that § 324A of Restatement (Second) of Torts provided the proper framework in which to analyze this tort claim that arose out of a breach of contract between the defendants and the city. *Butler*, 282 Wis. 2d 776, ¶ 22. Section 324A provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

¶ 43. In *Miller v. Bristol-Myers Co.,* 168 Wis. 2d 863, 485 N.W.2d 31 (1992), we observed that the "word 'protect' in the introductory portion [of § 324A] apparently was a typographical error published in the Restatement and should be read 'perform.' " *Id.* at 882 n.7 (citation omitted). The proposed final draft for Restatement (Third) of Torts has re-worded the introductory paragraph thereby eliminating this concern.[1]

¶ 44. Wisconsin has a long history of attempting to maintain the distinction between contract and tort claims. *Landwehr v. Citizens Trust Co.,* 110 Wis. 2d 716, 720, 329 N.W.2d 411 (1983). In *Landwehr,* the issue presented was whether a breach of contract is actionable as a tort. *Id.* There, Oswald Landwehr sued his father's estate, claiming his father had been negligent in failing to make the will he had promised to make. *Id.* at 717–19. We reasoned that Landwehr had no tort

---

[1] Restatement of the Law Third, Torts: Liability for Physical Harm, Proposed Final Draft No. 1 (Apr. 6, 2005), renumbered § 324A to § 43 and revised the introductory paragraph as:

> An actor who undertakes to render services to another that the actor knows or should know reduce the risk of physical harm to which a third person is exposed has a duty of reasonable care to the third person in conducting the undertaking if:
>
> (a) the failure to exercise reasonable care increases the risk of harm beyond that which existed without the undertaking,
>
> (b) the actor has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the person to whom the services are rendered, the third party, or another relies on the actor's exercising reasonable care in the undertaking.

423

claim against his father's estate because even if we were to assume that there were such a promise by his father, in order for a tort claim to arise, "there must be a duty [to make a will in favor of Landwehr] existing independently of the performance of the contract for a cause of action in tort to exist." *Id.* at 723. By way of further explanation, we quoted William L. Prosser, *Handbook of the Law of Torts* § 92, at 617–18 (4th ed. 1971), "[T]here will be liability in tort for misperformance of a contract whenever there would be liability for gratuitous performance [of the act] without the contract." *Landwehr,* 110 Wis. 2d at 723.

¶ 45. The use of § 324A by Wisconsin courts appears in our attempts to sort out when circumstances that began with an undertaking of some sort, either gratuitous or for pay, could give rise to a tort. For example, in *American Mutual Liability Insurance Co. v. St. Paul Fire & Marine Insurance Co.,* 48 Wis. 2d 305, 179 N.W.2d 864 (1970), we said that § 324A provided "the proper rule of law" for analyzing whether an insurance company's gratuitous inspection of a boiler, which inspection was known to the company and on which the company relied in not conducting its own inspection, could result in tort liability for the insurance company. *Id.* at 313.

¶ 46. A similar § 324A approach is found in the analysis of the claims in *Miller.* There, we used § 324A to determine whether a parent company that gave day-to-day advice to a subsidiary corporation on safety issues was liable in tort to the employees of the subsidiary who were harmed because the subsidiary company took the advice of the parent company. *Miller,* 168 Wis. 2d at 883–84. We explained:

> Section 324A establishes when an assumption of duty arises and the grounds for liability thereunder. The

> introductory portion establishes when an assumption of duty arises. The elements for an assumption of duty to arise are that the actor must: (1) undertake to render services, (2) to another, (3) which such actor should recognize as necessary for the protection of a third person.

*Id.* We noted that once it has been shown that a defendant assumed a duty with regard to another, "the remaining portion of the introduction and subsections (a), (b), and (c) [of § 324A], establish when liability for assuming such a duty arises." *Id.* at 884.

¶ 47. In *Gritzner v. Michael R.,* 2000 WI 68, 235 Wis. 2d 781, 611 N.W.2d 906, an adult offered to take care of a young girl. The defendant left the young girl unsupervised in the company of a boy known to have behaved in inappropriate ways, sexually, and she was assaulted. *Id., ¶* 2. We evaluated the adult's failure to control the children at his home under the provisions of § 324A. In so doing, we explained that "[t]his court has adopted the theory of negligence set forth in the Restatement (Second) of Torts § 324A." *Id., ¶* 56. We directed that the standard of conduct set out in § 324A "applies to anyone 'who, having no duty to act, gratuitously undertakes to act and does so negligently.' " *Id.* We concluded that the adult's inadequate control of a boy known to have inappropriate sexual propensities by leaving him unsupervised with the young girl in his care increased her risk of harm and therefore, he was liable for her injuries. *Id., ¶* 57.

¶ 48. In *Stephenson v. Universal Metrics, Inc.,* 2002 WI 30, 251 Wis. 2d 171, 641 N.W.2d 158, we once again employed the provisions of § 324A. In *Stevenson,* a fellow employee offered to give a co-employee who was intoxicated a ride home. Based on that offer, the bartender continued to provide alcohol. However, when it

was time to go home, no ride was given and a terrible accident occurred where two people died. *Id.,* ¶ 2. When suit was brought, the defendants argued that there was no duty to give the drunken employee a ride home; therefore, the complaint should be dismissed. *Id.,* ¶ 14. We disagreed, pointing out that we have applied § 324A in numerous cases and as we have applied it, "the framework of § 324A comports with Wisconsin's principles of negligence law." *Id.,* ¶ 23. This is so because although a person may have no duty to perform an act, if he undertakes to do so, he must exercise reasonable care in performing it. *Id.*

¶ 49. Our use of § 324A comports with general negligence principles because it does not preclude a tort claim where one would otherwise exist. Rather, it assists in maintaining an analysis that preserves the differences between contract and tort claims, while recognizing that some factual circumstances can give rise to both types of claims.

2. The application of § 324A

¶ 50. In the case now before us, none of the defendants had an obligation to enter into a contract with the City. None had any obligation to attempt to correct the Lake's flooding problem. They are sued by the plaintiffs solely because they contracted with the City to construct a system to reduce naturally occurring flooding and the system they constructed failed to do so. Therefore, the defendants have undertaken to render services that they should recognize as necessary to protect the property owners at the Lake's edge. Accordingly, they come within the ambit of the introductory paragraph of § 324A. They are liable to the property owners if the conditions contained in one of the three

subsections of § 324A are met and the plaintiffs suffered physical harm. *See Miller,* 168 Wis. 2d at 884–86.

¶ 51. Subsection (a) involves increased risk of harm.[2] The property owners claim their risk of harm was increased because the water level continued to rise when the defendants breached their contracts with the City to lower the Lake's water level. The plaintiffs do not claim that some act of the defendants caused more water to enter the Lake; they claim only that the defendants were ineffective in lowering the water level. There is nothing in the record to imply that the defendants' failure to exercise reasonable care in their undertakings for the City increased the risk of harm to the property owners beyond that which was present before the defendants began their contracts with the City. Therefore, because § 324A(a) is not satisfied, no liability arises under that subsection.

¶ 52. Subsection (b) requires that the defendants perform a duty owed by another.[3] The property owners claim that the City had a legal duty to lower the water level because of agreements the City made with the DNR. I see no merit in this argument, and I agree with the conclusion of the court of appeals that any obligation of the City to the DNR does not translate into a duty of the City to the property owners. The plaintiffs point to nothing in the record that would infer that the City had an obligation to the plaintiffs to reduce the Lake's flooding, although it repeatedly tried to do so. Further, as we have repeatedly held, "[d]ecisions concerning the adoption, design, and implementation of a

---

[2] Section 324A(a) provides: "his failure to exercise reasonable care increases the risk of such harm."

[3] Section 324A(b) provides: "he has undertaken to perform a duty owed by the other to the third person."

public works system are discretionary, legislative decisions." *Milwaukee Metro,* 277 Wis. 2d 635, ¶ 9. Accordingly, because the City had no duty to the plaintiffs to lower the water level in the Lake, the defendants were not performing a duty owed by the City to the property owners when they attempted to lower the water level. Therefore, liability will not arise under § 324A(b).

¶ 53. Subsection (c) requires a finding of harm due to reliance.[4] Reliance has a factual foundation. *Kaloti Enters., Inc. v. Kellogg Sales Co.,* 2005 WI 111, ¶ 26, 283 Wis. 2d 555, 699 N.W.2d 205. However, there is not one affidavit from one property owner or from the City averring that any one of them was harmed because of reliance on the undertakings of the defendants. For example, there is no affidavit asserting that the plaintiffs refrained from efforts they would otherwise have undertaken to hold back the rising Lake water level because of the contract between the City and the defendants.

¶ 54. In addition, the City claims to have suffered no "harm" because of the defendants' unsuccessful efforts.[5] The plaintiffs contend that because they were assessed to pay a portion of the costs of the City's contracts with the defendants, the assessments they paid were a "harm" as they did not get the benefit expected. However, even if we assume that were so, the plaintiffs would have suffered only an economic harm and the introductory paragraph to § 324A requires that a "physical harm" result from the failed undertaking.

----

[4] Section 324A(c) provides: "the harm is suffered because of reliance of the other or the third person upon the undertaking."

[5] This is likely true because the City sued the defendants for breach of contract and a settlement was achieved that was satisfactory to the City.

Therefore, the criteria of § 324A(c) are not fulfilled by the facts before the court. Accordingly, applying § 324A leads me to the conclusion that the plaintiffs have presented no evidence that would create a disputed issue of material fact entitling them to a trial on their negligence claims when analyzed under § 324A.

## III. CONCLUSION

¶ 55. The majority has chosen to deny liability based on a public policy factor. When we employ public policy factors to preclude liability, we engage in judicial line-drawing wherein we conclude there is the lack of a sufficient legal cause to hold a defendant liable. *Fandrey,* 272 Wis. 2d 46, ¶ 16. In so doing, we employ a case-by-case analysis that provides little guidance·for the courts, future litigants, or the public that may face similar legal issues in the future. I write separately because I conclude that the court should have analyzed the plaintiffs' claims under Restatement (Second) of Torts § 324A. In my view, doing so would have provided more guidance to those who assert or defend a tort claim based on the breach of a contract to which the plaintiff was not a party. Accordingly, I respectfully concur in the majority opinion affirming the court of appeals.

¶ 56. ANN WALSH BRADLEY, J. (*dissenting*). This court has repeatedly explained that only in those cases where the facts are simple to ascertain and the public policy questions have been fully presented may a court review public policy and preclude liability before trial. *Gritzner v. Michael R.,* 2000 WI 68, ¶ 26, 235 Wis. 2d 781, 611 N.W.2d 906; *Sawyer v. Midelfort,* 227 Wis. 2d 124, 141, 595 N.W.2d 423 (1999); *Bowen v. Lumbermens Mut. Cas. Co.,* 183 Wis. 2d 627, 655, 517

N.W.2d 432 (1994); *Schuster v. Altenberg,* 144 Wis. 2d 223, 241, 424 N.W.2d 159 (1988); *Coffey v. City of Milwaukee,* 74 Wis. 2d 526, 542, 247 N.W.2d 132 (1976).

¶ 57. Thus, the better practice is generally to submit a case to the jury before determining whether public policy factors should preclude liability. *Smaxwell v. Bayard,* 2004 WI 101, ¶ 41, 274 Wis. 2d 278, 682 N.W.2d 923. "The cases in which a causally negligent tort-feasor has been relieved of liability are infrequent and present unusual and extreme considerations." *Stewart v. Wulf,* 85 Wis. 2d 461, 479, 271 N.W.2d 79 (1978).

¶ 58. "The court has stated the[] public policy considerations that may preclude liability in capsule form as follows: When it would shock the conscience of society to impose liability, the courts may hold as a matter of law that there is no liability." *Bowen,* 183 Wis. 2d at 656; *see also Fandrey ex rel. Connell v. American Family Mut. Ins. Co.,* 2004 WI 62, ¶ 15, 272 Wis. 2d 46, 680 N.W.2d 345.

¶ 59. The majority's conscience is easily shocked.

¶ 60. I dissent for three reasons. First, I would follow the better practice and decline to apply the public policy factors on the summary judgment record before us. Second, even if I were to attempt an application of the factors on the present record, that application would not justify limiting liability at this stage of proceedings. Third, I write to observe that this case illustrates why there is often an uncomfortable fit between summary judgment methodology and application of the public policy factors.

I

¶ 61. In order to determine whether liability for negligence should be limited, Wisconsin courts apply six public policy factors. The courts are to ask whether:

(1) the injury is too remote from the negligence; (2) the injury is too wholly out of proportion to the tortfeasor's culpability; (3) in retrospect it appears too highly extraordinary that the negligence should have resulted in the harm; (4) allowing recovery would place too unreasonable a burden on the tortfeasor; (5) allowing recovery would be too likely to open the way for fraudulent claims; [or] (6) allowing recovery would enter a field that has no sensible or just stopping point.

*See, e.g., Gritzner,* 235 Wis. 2d 781, ¶ 27.

¶ 62. The majority ignores the better practice and applies only one of the six public policy factors to preclude liability for negligence. It does so on summary judgment even though the facts are not yet well developed and not simple to ascertain. The majority thereby cuts off the potential for liability before the public policy questions this case might raise are even fully presented.[1]

¶ 63. Given that it is too early to effectively apply the public policy factors, I am not surprised that the majority's analysis of public policy amounts to essentially no analysis whatsoever.

¶ 64. The reader can decide whether the majority's public policy "analysis" is convincing to anyone other than the majority. In order to assist the reader, I will summarize the majority's analysis. This is easily done because its entire analysis consists of six paragraphs amounting to two reasons for its conclusion to limit liability for negligence: (1) its assertion that this case is similar to *Rockweit v. Senecal,* 197 Wis. 2d 409, 541 N.W.2d 742 (1995), and (2) its application of one of the six

---

[1] I need not and do not separately address the majority's analysis of the landowners' nuisance claims. As the majority correctly recognizes, liability for a nuisance claim based on negligence is subject to limitation based on the same public policy factors. *See* majority op., ¶ 32.

431

public policy factors to conclude that allowing liability here would have no just or sensible stopping point. *See* majority op., ¶¶ 21–26.

¶ 65. The majority's assertion that this case is similar to *Rockweit* is curious. Why? Because *Rockweit* was a case in which the court followed the better practice, applying the public policy factors *after* the facts were fully developed at a jury trial. *Rockweit,* 197 Wis. 2d at 416–17, 426–29.

¶ 66. There is no shortage of cases in which this court has declined to apply the public policy factors to preclude liability before a case has been tried. *See, e.g., Alvarado v. Sersch,* 2003 WI 55, ¶ 30, 262 Wis. 2d 74, 662 N.W.2d 350; *Sawyer,* 227 Wis. 2d at 151; *Bowen,* 183 Wis. 2d at 660; *Schuster,* 144 Wis. 2d at 262–63; *Coffey,* 74 Wis. 2d at 541–43; *cf. Stewart,* 85 Wis. 2d at 481 (in which the court determined after a trial that "[t]his is not a case in which public policy considerations dictate that one should be relieved of liability").

¶ 67. Why does the majority fail to discuss any of these cases?[2]

¶ 68. As for the majority's two-paragraph discussion of one of the six public policy factors, it is wholly unpersuasive. I begin by quoting the majority's central rationale, and then explain why it is so unconvincing:

> If we were to permit liability against the defendants before us, we would be opening the door to property owners' claims against any contractor who contracts with a municipality to remediate a naturally occurring hazard, when the contractor fails to completely abate the hazard's effects. This broad exposure to liability would chill municipalities' efforts in at-

_____

[2] The majority cites some of these cases in passing when it sets forth the public policy factors. Majority op., ¶¶ 19–20.

tempting abatement projects. It could also chill contractors from bidding on those types of municipal projects; where in addition to being subject to a breach of contract action by the municipality for not performing as they had contracted to perform, the contractors would be subject to litigation by any property owner who would have benefited from a successfully performed municipal contract.

Majority op., ¶ 25.

¶ 69. There are at least three reasons why the majority's application of this public policy factor is unconvincing.[3]

¶ 70. First, the majority comes perilously close to setting forth a blanket rule of immunity from liability for all contractors that contract with municipalities. It is difficult to imagine how the majority's reasoning can be limited in any principled manner to contractors who contract with municipalities "to remediate a naturally occurring hazard." *Id.* Are contractors who contract with municipalities for purposes other than remediation of a "naturally occurring hazard" really situated any differently under the majority's rationale? I am concerned that there are ramifications to the majority's cursory analysis that may reverberate well beyond the facts of this case to provide immunity where none previously existed.

¶ 71. Second, the blanket rule of immunity that the majority comes close to adopting seems to render superfluous case law providing that private contractors who contract with the government may be entitled to

---

[3] I acknowledge case law stating that liability may be denied solely on the basis of one public policy factor. *See Smaxwell v. Bayard,* 2004 WI 101, ¶ 41, 274 Wis. 2d 278, 682 N.W.2d 923. The controlling nature of one or more factors under the facts of a particular case should not mean, however, that the court simply abdicates all responsibility to inquire into the remaining factors.

immunity when certain conditions are met. *See Estate of Lyons v. CNA Ins. Cos.*, 207 Wis. 2d 446, 457–58, 558 N.W.2d 658 (Ct. App. 1996); *see also Jankee v. Clark County*, 2000 WI 64, ¶ 44, 235 Wis. 2d 700, 612 N.W.2d 297.

¶ 72. Under *Lyons,* an independent contractor who follows governmental directives can be entitled to immunity when:

> (1) the governmental authority approved reasonably precise specifications;

> (2) the contractor's actions conformed to those specifications; and

> (3) the contractor warned the supervising governmental authority about the possible dangers associated with those specifications that were known to the contractor but not to the governmental officials.

*Lyons,* 207 Wis. 2d at 457–58. The court of appeals has explained "[t]his three-part test will ensure that state and municipal government, and the public at large, is able to make the best use of professional design assistance, but that professional contractors are not unfairly burdened by lawsuits when they follow governmental directives." *Id.* at 458.

¶ 73. The majority fails to explain how its opinion squares with the *Lyons* rule. Indeed, it fails to even acknowledge that the *Lyons* rule exists. Is it sub silentio overruling *Lyons?*

¶ 74. Third, the majority cites no facts of record for its speculative assertion that imposing liability here would chill municipalities' efforts in attempting abatement projects and would chill contractors from bidding on those types of projects. Just as likely, imposing liability would chill tortious conduct.

¶ 75. The reader can now decide whether the majority's six- paragraph analysis analogizing to *Rockweit* and applying one of the six public policy factors is persuasive to anyone but the majority.

## II

¶ 76. To the extent possible on the limited record before us, I now turn to address the public policy factors that the majority ignores. To the extent those factors can be applied on the present record, they do not justify limiting liability.

¶ 77. **Whether the injury is too remote from the negligence** and **whether in retrospect it appears too highly extraordinary that the negligence should have resulted in the harm**. The application of each of these two factors weighs in favor of liability. There can be no real dispute that everyone involved was keenly aware of what would happen if the defendants negligently failed to perform their contract obligations. The lake would continue to rise resulting in damages to surrounding landowners. It is not highly extraordinary that the defendants' negligence in designing or constructing the drainage system in this case would result in property damage to the landowners.

¶ 78. **Whether the injury is too wholly out of proportion to the tortfeasor's culpability** and **whether allowing recovery would place too unreasonable a burden on the tortfeasor.** It is too early in this litigation to apply these factors in any meaningful sense because the extent of the damages to the property owners remains unknown. Also unknown at this stage in the proceedings is how comparative negligence principles may affect the extent of any liability burden on the defendants. *See Stewart,* 85 Wis. 2d at 480–81 (declining

435

to apply public policy factors and distinguishing cases that applied the factors because those cases did not involve issues of comparative negligence).

¶ 79. **Whether allowing recovery would be too likely to open the way for fraudulent claims**. The majority recites no facts of record suggesting that to allow recovery in this case would likely open the way for fraudulent claims. This is because there are no such facts. Given the facts that we know, it is difficult to conceive how allowing recovery would be too likely to open the way for fraudulent claims.

¶ 80. Having addressed all six public policy factors to the extent possible on the limited record before us, I conclude that their application does not justify limiting liability at this stage of the proceedings. Rather, the case before us is one where "[a] trial court or jury finding as to actual negligence, damage and the causal relationship between them would be material and helpful in evaluating the public policy considerations." *Coffey*, 74 Wis. 2d at 543.

### III

¶ 81. Finally, I write because this case illustrates why there will often be an uncomfortable fit between summary judgment methodology and application of the public policy factors. This uncomfortable fit further highlights why it is typically ill-advised to limit liability using those factors at the summary judgment stage of proceedings.

¶ 82. As the majority knows, the cardinal principles of summary judgment methodology include that "[s]ummary judgment should not be granted, unless the facts presented conclusively show that the plaintiff's

436

action has no merit and cannot be maintained." *Mrozek v. Intra Fin. Corp.*, 2005 WI 73, ¶ 14, 281 Wis. 2d 448, 699 N.W.2d 54 (internal quotations and citations omitted). The court is required to "view the summary judgment materials in the light most favorable to the nonmoving party." *Id.* Stated another way, all reasonable inferences to be drawn from the evidence of record must be viewed in the light most favorable to the nonmoving party. *Johnson v. Rogers Mem'l Hosp., Inc.*, 2005 WI 114, ¶ 30, 283 Wis. 2d 384, 700 N.W.2d 27.

¶ 83. The outcome of this case would be different if the majority were actually to apply these cardinal summary judgment principles. Instead, the majority stops with rote recitation of summary judgment principles. *See* majority op., ¶ 18.

¶ 84. The majority assures the reader that the "relevant facts relating to the attempted water abatement are not disputed." *Id.*, ¶ 21. It also assures the reader that "the facts of record are sufficiently developed . . . to undertake a public policy analysis." *Id.* How can the majority make these assurances when facts material to cause, damages, and a meaningful application of the public policy factors remain disputed in this case?

¶ 85. The parties dispute whether the defendants' negligence was a cause of the landowners' damages. The engineering firm hired by the City to investigate the failed drainage project concluded that the pipeline failure stemmed from design and material defects along with failure to test the materials.

¶ 86. The defendants in this case undertook to control the lake's water level. The landowners maintain that if the defendants had exercised ordinary care in the design and testing of the pipeline, then the water level would have receded. They assert that the defendants'

negligence thus caused the lake level to rise which, in turn, caused the damage to their property. The defendants dispute the allegations of negligence and assert that the facts reveal the exercise of ordinary care.

¶ 87. The uncomfortable fit is further illustrated by the rationale focusing on cause (a substantial factor) employed by the majority. In essence, the majority's position is that the defendants' negligence did not cause any injury because it would have happened anyway. *See id.,* ¶ 24 ("[i]t is probable that absent any act by the defendants, the plaintiffs, nevertheless, would have suffered damages.").

¶ 88. The majority takes the plaintiffs to task for their assertion that "a cause of this invasion is the defendants' unsuccessful abatement actions." *Id.,* ¶ 32. Ultimately the majority concludes that "there is no dispute that the defendants did nothing to cause the Lake's rising water level." *Id.* It is with this ultimate conclusion that the inconsistency of the majority's position is highlighted.

¶ 89. How can the majority on the one hand conclude that there are no facts which would support a finding of causation, while on the other hand state that in its public policy determination it assumes the defendants' negligence caused the damages? *See id.,* ¶ 21 ("[W]e assume there is negligence and that the negligence was a cause of the injury" when we apply public policy factors.).

¶ 90. The majority cannot have it both ways. It cannot both assume that the defendants' negligence was a cause of the plaintiffs' damages while at the same time conclude that there are no facts in dispute that would support a finding of causal negligence.

¶ 91. In addition, factual disputes remain as to the amount of damages, apportionment of liability, and

mitigation of damages, all of which implicate the magnitude of the injury and the consequent burden on the defendants. One of the defendants explains in its brief that the circuit court denied class certification to the landowners because of:

> concern over the number of plaintiffs who would have to testify, the proof of individual damage claims[,] and how the affirmative defenses of contributory negligence and mitigation of damages would be dealt with as a class action.

¶ 92. Another defendant, in discussing why the circuit court properly denied class certification, explains similarly:

> Each of those issues [apportionment of liability, mitigation, and the landowners divergent damages claims] *involves complex and disputed sets of fact[s]* that are unique to each particular property owner . . . .

(Emphasis added.)

¶ 93. As already explained, the court cannot meaningfully apply the public policy factors of whether the injury is too wholly out of proportion to the tortfeasor's culpability or whether allowing recovery would place too unreasonable a burden on the tortfeasor when it does not know the extent of the requisite injuries or burdens. The myriad factual disputes likely implicate additional public factors as well. Yet the majority assures us that the "relevant facts relating to the attempted water abatement are not disputed" and that "the facts of record are sufficiently developed . . . to undertake a public policy analysis." Majority op., ¶ 21.

¶ 94. The remaining factual disputes preclude a meaningful application of the public policy factors. Moreover, if the majority were to construe reasonable

439

inferences from the disputed material facts in favor of the landowners as it is required to do, it could not apply the factors to preclude liability on summary judgment. This case is a prime example of the uncomfortable fit between summary judgment methodology and a proper application of the public policy factors.[4]

## IV

¶ 95. In sum, I would follow the better practice and decline to apply the public policy factors on the summary judgment record before us. Even if I were to attempt an application of the factors on the present record, however, that application would not justify limiting liability at this stage of proceedings. Accordingly, I respectfully dissent.

¶ 96. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice LOUIS B. BUTLER join this dissent.

---

[4] I do not maintain that it is never correct to apply the public policy factors to preclude liability at the summary judgment or earlier stage of proceedings. Such application is appropriate, however, only when the facts are simple to ascertain and the public policy questions have been fully presented. *Alvarado v. Sersch,* 2003 WI 55, ¶ 18, 262 Wis. 2d 74, 662 N.W.2d 350; *Gritzner v. Michael R.,* 2000 WI 68, ¶ 26, 235 Wis. 2d 781, 611 N.W.2d 906; *Sawyer v. Midelfort,* 227 Wis. 2d 124, 141, 595 N.W.2d 423 (1999); *Bowen v. Lumbermens Mut. Cas. Co.,* 183 Wis. 2d 627, 655, 517 N.W.2d 432 (1994); *Schuster v. Altenberg,* 144 Wis. 2d 223, 241, 424 N.W.2d 159 (1988); *Coffey v. City of Milwaukee,* 74 Wis. 2d 526, 542, 247 N.W.2d 132 (1976).