Bryan CASPER, Susan Casper, Michael Casper,
a minor, by his Guardian ad Litem,
Thomas Casper, a minor, by his Guardian ad
Litem, Sara Janey, a minor, by her Guardian ad
Litem, and Sharon Janey,
Plaintiffs-Respondents-Petitioners,

BLUE CROSS BLUE SHIELD UNITED OF WISCONSIN,
Primax Recoveries, Inc., Allstate Insurance
Company, American Family Mutual Insurance
Company and Milwaukee County Department of
Health & Social Services, Involuntary-Plaintiffs,

v.

AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY,
Mark Wearing, Bestway Systems, Inc., RJW, Inc.,
Transport Leasing/Contract, Inc.,
Applied Industrial Technologies, Inc., Jeffrey E.
Wenham, United States Fidelity and Guaranty
Company, Federal Insurance Company,
Continental Casualty Company, John Doe,
Defendants,

RYDER TRUCK RENTAL, INC. and
Old Republic Insurance Company,
Defendants-Appellants.

Bryan CASPER, Susan Casper, Michael Casper, a
minor, by his Guardian ad Litem, Thomas
Casper, a minor, by his Guardian ad Litem, Sara

267

Janey, a minor, by her Guardian ad Litem, and Sharon Janey, Plaintiffs-Appellants-Petitioners,

BLUE CROSS BLUE SHIELD UNITED OF WISCONSIN, Primax Recoveries, Inc., Allstate Insurance Company, American Family Mutual Insurance Company and Milwaukee County Department of Health & Social Services, Involuntary-Plaintiffs,

v.

AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY, Mark Wearing, Bestway Systems, Inc., RJW, Inc., Transport Leasing/Contract, Inc., Applied Industrial Technologies, Inc., Jeffrey E. Wenham, Ryder Truck Rental, Inc., Old Republic Insurance Company, United States Fidelity and Guaranty Company, Federal Insurance Company, Continental Casualty Company and John Doe, Defendants,

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Defendant-Respondent.

Bryan CASPER, Susan Casper, Michael Casper, a minor, by his Guardian ad Litem, Thomas Casper, a minor, by his Guardian ad Litem, Sara Janey, a minor, by her Guardian ad Litem, and Sharon Janey, Plaintiffs-Respondents-Petitioners,

BLUE CROSS BLUE SHIELD UNITED OF WISCONSIN, Primax Recoveries, Inc., Allstate Insurance Company, American Family Mutual Insurance Company and Milwaukee County Department of Health & Social Services, Involuntary-Plaintiffs,

268

v.

AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY, Mark Wearing, Bestway Systems, Inc., RJW, Inc., Transport Leasing/Contract, Inc., Applied Industrial Technologies, Inc., Ryder Truck Rental, Inc., Old Republic Insurance Company, United States Fidelity and Guaranty Company, Federal Insurance Company, Continental Casualty Company, National Union Fire Insurance Company of Pittsburgh, PA., and John Doe, Defendants,

Jeffrey E. WENHAM, Defendant-Appellant-Petitioner.

Supreme Court

*Nos. 2006AP1229, 2006AP2512, 2007AP369.*
*Oral argument December 1, 2010.—Decided July 19, 2011.*

2011 WI 81

(Also reported in 800 N.W.2d 880.)

269

2006AP1229: For Plaintiffs-Respondents-Petitioners there were briefs by *Monte E. Weiss and Charles W. Kramer* and oral argument by *Alan H. Deutch, Deutch & Weiss, LLC.*

For the Defendants-Appellants there was a brief by *Larry J. Britton* and *Shannon M. Trevithick, Britton & Associates, S.C.*

2006AP2512: For Plaintiffs-Appellants-Petitioners there were briefs by *Alan H. Deutch, Charle W. Kramer, James L. McAlister and Monte E. Weiss, Deutch & Weiss, LLC*, and oral argument by *Monte E. Weiss*

For Defendant-Respondent there was a brief by *Ross A. Anderson* and *Timothy H. Posnanski, Whyte Hirschboeck Dudek S.C.*, and oral argument by *Ross A. Anderson*.

2007AP369: For Defendant-Appellant-Petitioner there were briefs by *Robert J. Lauer* and *Patti J. Kurth, Kasdorf, Lewis & Swietlik, S.C.*, and oral argument by *Robert J. Lauer.*

For Plaintiffs-Respondents-Petitioners there were briefs by *Alan H. Deutch, Charle W. Kramer, James L. McAlister and Monte E. Weiss, Deutch & Weiss, LLC*, and oral argument by *Alan H. Deutch.*

An amicus brief was filed by *James A. Friedman* and *Katherine Stadler, Godfrey & Kahn, S.C.*, for the Wisconsin Insurance Alliance and the Wisconsin Civil Justice Council, Inc. and by *Andrew C. Cook, The Hamilton Consulting Group LLC,* for the Wisconsin Civil Justice Council, Inc.

An amicus brief was filed by *Catherine M. Rottier, Boardman, Suhr, Curry & Field LLP,* for Wisconsin Defense Counsel.

¶ 1. DAVID T. PROSSER, J. This is a review of a published decision of the court of appeals, *Casper v. American International South Insurance Co.*, 2010 WI App 2, 323 Wis. 2d 80, 779 N.W.2d 444,[1] affirming three orders of the Milwaukee County Circuit Court, Christopher R. Foley, Judge. The case arises out of a tragic

---

[1] Three separate appeals were consolidated and decided by the court of appeals. *Casper v. Am. Int'l S. Ins. Co.*, 2010 WI App 2, ¶ 1, 323 Wis. 2d 80, 779 N.W.2d 444. From that decision, the

accident that occurred when a truck driven by Mark Wearing collided with the Casper family's minivan while it was stopped at an intersection. Bryan, Susan, Michael, and Thomas Casper, as well as Sara Janey, another passenger in the Casper vehicle (collectively, the Caspers), were all injured, some very seriously, in the accident.

¶ 2. The Caspers brought suit against 14 named defendants. Only 5 are relevant for purposes of this appeal: Mark Wearing; his co-employers Bestway Systems, Inc. (Bestway) and Transport Leasing/Contract Inc. (TLC); Bestway's CEO, Jeffrey Wenham (Wenham); and TLC's excess insurer, National Union Fire Insurance Company of Pittsburgh PA. (National Union). Both the Caspers and Wenham petitioned this court for review of the decision of the court of appeals.

¶ 3. These appeals present three issues to the court. First, did the circuit court properly exercise its discretion in granting National Union Fire Insurance Company an enlargement of time to answer the Caspers' Fifth Amended Complaint? National Union failed to answer the amended complaint within the time period required by statute but it claimed excusable neglect. The circuit court agreed. The Caspers contend that National Union did not satisfy the requirements for excusable neglect and that the circuit court erroneously exercised its discretion.

¶ 4. Second, can the Caspers maintain a direct action claim against National Union when its policy of insurance was neither delivered nor issued for delivery in Wisconsin but the insurance policy covers the insured's "business operations" conducted in this state?

Caspers and Jeffrey Wenham appealed. American International South Insurance Co. is not a party before this court.

Relying on *Kenison v. Wellington Insurance Co.*, 218 Wis. 2d 700, 582 N.W.2d 69 (Ct. App. 1998), the circuit court and court of appeals answered "no." In this review, the Caspers contend that a plain reading of Wis. Stat. § 631.01(1), together with Wis. Stat. § 632.24, authorizes direct action against an insurer in any of four situations stated in the disjunctive in Wis. Stat. § 631.01(1). Only one of these four situations requires delivery of the policy in Wisconsin.[2]

¶ 5. Third, can a corporate officer be held personally liable for a non-intentional tort that occurs while he is performing his job and which is within the scope of his employment for a solvent and insured corporation? If the answer is "yes," do public policy factors preclude a finding of liability on the part of Jeffrey Wenham as a matter of law? Both the circuit court and the court of appeals concluded that a corporate officer may be held personally liable for negligence that occurs while the corporate officer is performing duties for the corporation. Neither court addressed public policy issues. The court of appeals determined that there were sufficient issues of fact in the record to require additional proceedings rather than dismiss the claim on summary judgment.

¶ 6. We conclude the following:

¶ 7. First, the circuit court did not erroneously exercise its discretion in finding excusable neglect and granting National Union's motion to enlarge time by seven days to answer the amended complaint. It also did not erroneously exercise its discretion by denying the Caspers' motion for default judgment. The decision of the court of appeals on this issue is affirmed.

---

[2] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

¶ 8. Second, a liability insurance policy need not be delivered or issued for delivery in this state in order to subject the insurer to a direct action under Wis. Stat. §§ 632.24 and 803.04(2). *Kenison* is accordingly overruled, and the decision of the court of appeals on this issue is reversed.

¶ 9. Third, a corporate officer may be liable for non-intentional torts committed in the scope of his employment. In this instance, however, Jeffrey Wenham's actions are too remote to provide a basis for personal liability. We therefore reverse the court of appeals on this issue.

¶ 10. In sum, the decision of the court of appeals is affirmed in part, reversed in part, and the case is remanded to the circuit court for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND

¶ 11. The Casper and Janey families are from Sheboygan. On May 10, 2003, the Caspers took a family trip to Milwaukee. They were accompanied by son Michael's friend, Sara Janey.

¶ 12. Bryan Casper was driving the family minivan when he stopped at the intersection of 51st Street and Brown Deer Road in Brown Deer. Suddenly, the minivan was hit from behind by a truck driven by Mark Wearing. Wearing was traveling at approximately 40 miles per hour.

¶ 13. As a result of the collision, all five passengers in the Casper minivan were injured. Michael Casper was rendered a quadriplegic. Sara Janey suffered many serious injuries, including a traumatic brain injury, multiple leg and pelvis fractures, and loss of use of one of her kidneys. Bryan, Susan, and Thomas Casper all suffered lesser, but still serious, injuries.

¶ 14. Investigators found Wearing to be under the influence of oxycodone, diazepam, and nordiazepam at the time of the accident; they found two prescription pill containers in the cab of his truck.

¶ 15. At the time of the accident, Wearing was co-employed by TLC and Bestway. TLC is a foreign corporation doing business in Wisconsin, with its principal offices located in Minnesota. National Union is an insurer of TLC.

¶ 16. Bestway is a foreign corporation doing business in Wisconsin, with its principal offices located in Ohio. Jeffrey Wenham is the CEO of Bestway and an employee of Bestway's owner, RJW, Inc., a holding company. Bestway operates van and flatbed equipment and handles the transportation of its customers. Bestway maintains both general liability and trucker's liability insurance.

¶ 17. When Wearing collided with the Caspers' vehicle, Wearing was making a delivery for one of Bestway's customers, Applied Industrial Technologies, Inc. (AIT), whose corporate offices are in Cleveland, Ohio. Wenham was the salesman for Bestway's AIT account, and Wenham allegedly approved the route Wearing used when he was driving for AIT. This route was 536 miles long and took him through Indiana, Illinois, and Wisconsin. According to Wearing, AIT insisted that the route be completed overnight. He said he had been told that if he did not complete the route, he would be let go.

¶ 18. According to the Caspers' expert, the route Wearing was driving when the accident took place could not be driven within the hours of service requirements of the Federal Motor Carrier Safety Regulations (FMCSR). In his deposition, Wearing stated that he contacted his supervisor at Bestway, Doug Hofmann

(Hofmann), and told him that he could not "possibly do the run and keep this under the time with loading and unloading, and [the supervisor] said[,] well, what we do is mark that as off duty and that will give you the time." Such practice, the Caspers' expert asserted, would violate FMCSR § 395.2, which requires that time spent loading and unloading a commercial vehicle must be recorded as "on-duty."

¶ 19. For the purposes of his summary judgment motion and appeal, Wenham stipulated that he had approved the route driven by Wearing, although he asserts he did not set up the AIT routes. The AIT routes were set up by Lyle Marion and Hofmann, employees of Bestway.

¶ 20. In Wenham's own deposition, he explained that the initial route put together by Hofmann would not have required his approval. The AIT routes were reviewed by Bestway's safety department for compliance with all applicable laws. According to Hofmann's testimony, any changes would have been approved by Wenham. Wenham never met Wearing and was never involved in Wearing's hiring, training, or supervision.

## II. PROCEDURAL HISTORY

¶ 21. Following the accident, the Caspers brought suit against multiple parties. National Union, TLC's excess insurer, was named in one of the early amended complaints. On May 5, 2006, the Caspers served National Union with the Fifth Amended Complaint. National Union's claim specialist, Lynn Weisinger (Weisinger), received the Caspers' Fifth Amended Complaint in New Jersey on May 11, 2006. On May 16, 2006, Weisinger's assistant mailed the Complaint to Charles Lanphear (Lanphear), a claims specialist in Atlanta,

Georgia, who handled trucking liability accidents. However, the Complaint was either inadvertently mishandled or lost in the mail, and thus Lanphear never received the Complaint and did not file an Answer within the 45–day time limit set out in the Complaint and mandated by statute. Wis. Stat. § 802.06(1).

¶ 22. On June 20, 2006, the day after National Union's Answer was due, the Caspers moved for default judgment. On June 26, 2006, National Union filed its Answer and moved for an enlargement of time under Wis. Stat. § 801.15(2)(a). The Caspers moved to strike National Union's Answer, but the motion was denied. The circuit court granted National Union's motion to enlarge time, finding that National Union's failure to respond, due to the Complaint being "lost in the mail," satisfied the statutory requirement of excusable neglect.

¶ 23. On August 15, 2006, National Union moved for summary judgment, claiming that the Caspers' direct action claims were impermissible under Wis. Stat. §§ 631.01 and 632.24 because National Union's insurance policy covering TLC was not delivered or issued for delivery in Wisconsin. Relying on *Kenison,* the circuit court granted summary judgment to National Union, and the court of appeals affirmed the circuit court's order. *Casper,* 323 Wis. 2d 80, ¶ 29. National Union remained a party to the action, however, under Wis. Stat. § 803.04(2).

¶ 24. The Caspers appealed both orders. They argued that as a matter of law, "lost in the mail" could not constitute excusable neglect. The court of appeals affirmed the circuit court's decision, concluding that the Complaint being lost in the mail could happen to a reasonably prudent person and therefore satisfied the

standard for excusable neglect under *Hedtcke v. Sentry Insurance Co.,* 109 Wis. 2d 461, 326 N.W.2d 727 (1982).

¶ 25. The Caspers also challenged the circuit court's application of *Kenison,* but the court of appeals affirmed the order granting National Union's motion for summary judgment based on *Kenison.* Thereafter, the Caspers petitioned this court for review.

¶ 26. In a separate cause of action, the Caspers brought suit against Wenham, asserting various personal liability claims against him as an individual, including negligent training and supervision of Wearing, and claims pertaining to alleged violations of the Federal Motor Carrier Safety Act and its related regulations. The circuit court granted Wenham summary judgment on grounds there was no basis for personal liability, thereby dismissing all the Caspers' claims against Wenham. Upon the Caspers' motion for reconsideration, however, the court reversed its earlier ruling and reinstated one claim against Wenham, pertaining to his approval of Wearing's allegedly illegal route. In so doing, the court recognized that it had failed to consider testimony obtained in depositions that indicated Wenham had approved the route that Wearing followed on the date of the accident. Wenham disputes that fact, claiming he admitted approving the route only for purposes of the summary judgment motion. The circuit court found sufficient evidence in the record to raise material issues of fact surrounding Wenham's alleged negligent approval of the route driven by Wearing.

¶ 27. Wenham appealed the circuit court's order reinstating the personal liability claim against him for negligence. Wenham denied approving the route and argued that a corporate officer could not be held personally liable for negligence committed in the scope of his employment. Alternatively, he contended that even

282

if he had acted negligently, public policy precluded such personal liability. Specifically, Wenham argued it was not foreseeable that Wearing would be under the influence of prescription drugs while driving.

¶ 28. The court of appeals affirmed the circuit court's order reinstating the claim, thereby denying Wenham's motion for summary judgment. *Casper*, 323 Wis. 2d 80, ¶¶ 71–74. Citing *Oxmans' Erwin Meat Co. v. Blacketer,* 86 Wis. 2d 683, 273 N.W.2d 285 (1979), the court of appeals concluded that personal liability against corporate officers is not limited solely to the intentional tort of fraudulent misrepresentation; rather, personal liability against corporate officers may be applied generally to all torts. *Id.*, ¶ 71. The court of appeals also affirmed the circuit court's finding that the record contained sufficient evidence to create a material issue of fact as to whether Wenham approved Wearing's route. *Id.*, ¶ 73.

¶ 29. The Caspers and Wenham petitioned this court for review, which we granted on January 20, 2010.

## III. STANDARD OF REVIEW

██ ██

¶ 30. The first issue centers on the circuit court's finding of excusable neglect by National Union. The decision to grant a motion to enlarge time for filing an answer, and correspondingly to deny a default judgment, rests in the sound discretion of the circuit court. *Hedtcke,* 109 Wis. 2d at 470. We review the decision of the circuit court for erroneous exercise of discretion; we do not look to "whether this court would or would not have granted . . . relief but rather whether the circuit court abused its discretion in reaching its decision." *Id.*

¶ 31. The second issue, whether National Union may be subject to a direct action under Wis. Stat. §§ 632.24 and 631.01(1), requires the court to interpret both statutes. Statutory interpretation presents a question of law that we review de novo. *Konneker v. Romano*, 2010 WI 65, ¶ 24, 326 Wis. 2d 268, 785 N.W.2d 432.

¶ 32. The third issue, whether a corporate officer may be held liable for a non-intentional tort committed in the scope of his employment, comes to this court via the circuit court's reinstatement of the claim against Wenham after it initially granted his motion for summary judgment.[3] Summary judgment is appropriate when there is no material fact in dispute and the moving party is entitled to judgment as a matter of law. *Blum v. 1st Auto & Cas. Ins. Co.*, 2010 WI 78, ¶ 14, 326 Wis. 2d 729, 786 N.W.2d 78. We review the circuit court's grant or denial of a motion for summary judgment de novo. *Id.* Whether public policy precludes liability in the context of a negligence claim also is a question of law. *Gritzner v. Michael R.*, 2000 WI 68, ¶ 27, 235 Wis. 2d 781, 611 N.W.2d 906.

## IV. DISCUSSION

¶ 33. We first consider the question of excusable neglect and review the standard by which a circuit

---

[3] At the court of appeals, the parties disagreed on whether Wenham was appealing the circuit court's order on motion to reconsider (an exercise of discretion) or the circuit court's order on motion for summary judgment (a question of law reviewed de novo). *Casper*, 323 Wis. 2d 80, ¶ 69. Before this court, the parties agree, and the court holds, that the proper standard of review is de novo.

court must determine whether a party has demonstrated that its failure to timely respond may be excused. Next, we turn to the interplay of Wis. Stat. §§ 631.01 and 632.24 and other statutes to determine whether insurers who have not delivered policies or issued policies for delivery in this state may be subject to direct action. Finally, we consider whether Wenham, as a corporate officer, may be held personally liable for a non-intentional tort committed in the scope of his employment.

## A. Excusable Neglect

¶ 34. The Caspers appeal the circuit court's grant of National Union's motion to enlarge time to answer the Caspers' complaint and its denial of their motion for default judgment. Under Wis. Stat. § 802.06(1), an insurer defendant is required to serve a reply or answer within 45 days. It is undisputed that National Union did not serve its answer within 45 days, and did not file its motion for enlargement of time until a full week after time to answer had passed.

¶ 35. Wisconsin Stat. § 801.15(2)(a) provides:

> When an act is required to be done at or within a specified time, the court may order the period enlarged but only on motion for cause shown and upon just terms. . . . If the motion is made after the expiration of the specified time, it shall not be granted unless the court finds that the failure to act was the result of excusable neglect.

██

¶ 36. A circuit court's finding of excusable neglect "will not be disturbed by an appellate court unless an [erroneous exercise] of discretion is clearly shown." *Hedtcke,* 109 Wis. 2d at 470. The decision of the circuit

court need not be one that this court would have rendered, but it must be based on a reasonable inquiry and examination of the facts. *Howard v. Duersten,* 81 Wis. 2d 301, 305, 260 N.W.2d 274 (1977). Furthermore, the reasons for the circuit court's decision must be set forth as required under the statute. *See* Wis. Stat. § 801.15(2)(a) ("The order of enlargement shall recite . . . the grounds for granting the motion.").

■

¶ 37. We have defined excusable neglect as "that neglect which might have been the act of a reasonably prudent person under the same circumstances," but which is not "synonymous with neglect, carelessness or inattentiveness." *Giese v. Giese,* 43 Wis. 2d 456, 461, 168 N.W.2d 832 (1969). A circuit court must determine whether reasonable grounds exist for failing to meet the statutory time period to grant a party's motion under § 801.15(2)(a). *Hedtcke,* 109 Wis. 2d at 468.

■■

¶ 38. A determination of excusable neglect does not rest solely on the existence of reasonable grounds for the party's delay. *Id.* at 469. A court also must consider the interests of justice implicated by the grant or denial of the motion, and what effects such a ruling would have on the proceedings. *Id.* The denial of a motion for enlargement of time often results in a default judgment for the plaintiffs, a result disfavored by the law, which "prefers, whenever reasonably possible, to afford litigants a day in court and a trial on the issues." *Dugenske v. Dugenske,* 80 Wis. 2d 64, 68, 257 N.W.2d 865 (1977) (citing *Quinn Distrib. v. Miller,* 43 Wis. 2d 291, 296, 168 N.W.2d 552 (1969)). On the other hand, the court also must be cognizant of the policies of prompt adjudication that can be advanced when a party that has failed to timely respond is held accountable for

286

such delay. *Id.* It is these considerations, together with the particular facts of the case, that must inform the circuit court's decision whether to grant a motion to enlarge time.

¶ 39. Although the analysis in each case is fact specific, we find it helpful to examine some of the cases in which the court has considered excusable neglect in the past.

¶ 40. Long before the advent of the statutory requirements of § 801.15(2)(a), this court held that the grant of a motion to enlarge time requires good cause, which must be supported by affidavit or a finding of fact by the circuit court. *Meyers v. Thorpe,* 227 Wis. 200, 202, 278 N.W. 462 (1938). In *Meyers,* this court reversed the circuit court's order enlarging plaintiff's time to serve a proposed bill of exceptions. *Id.* The explanation proffered by the plaintiff's attorney for failing to comply with the statutory timeframe was that he had been occupied by other cases requiring his attention. *Id.* at 201. The court held that there was no evidence to show that the attorney's other cases required such continuous attention to justify his failure to serve the bill within 90 days, as required by statute. *Id.*

¶ 41. Similarly, in *Giese,* the court rejected the attorney's contention that other legal matters, summer vacations, and his client's medical treatment in another county excused the filing of a complaint 78 days after the statutory time limit. *Giese,* 43 Wis. 2d at 461–62. Without "extraordinary" or "persuasive" explanation, these meager excuses were insufficient to support the motion for enlargement of time. *Id.* In affirming the circuit court, the court observed, "A trial court's discretion in the enlargement of statutory time limits cannot be predicated upon judicial grace but must rest upon cause and excusable neglect." *Id.* at 463.

¶ 42. In *Hedtcke,* this court reversed the circuit court's finding of excusable neglect on grounds that the circuit court had failed to follow the mandates of Wis. Stat. § 801.15(2)(a), and also failed to resolve the ambiguities raised by the affidavits in favor of the delinquent party. *Hedtcke,* 109 Wis. 2d at 474, 478. It was not enough for Sentry to assert that its attorney had been occupied with another trial and out of state depositions; Sentry's prompt action in remedying its failure to file an answer could not overcome the statutory requirement to demonstrate excusable neglect for its dilatory actions. *Id.* at 474–75. The facts in the record were simply insufficient to support the circuit court's implicit finding of excusable neglect. *Id.*

¶ 43. Conversely, in *Meier v. Champ's Sport Bar & Grill,* 2001 WI 20, ¶ 43, 241 Wis. 2d 605, 623 N.W.2d 94, the court affirmed the circuit court's finding of excusable neglect where the circuit court found that the dilatory action was a result of counsel's assumption that defendants were served simultaneously. Because the circuit court applied the proper standard and properly considered both the policies against default judgment and the lack of prejudice to the plaintiff, there was no basis to conclude that the circuit court erroneously exercised its discretion. *Id.,* ¶ 44.

¶ 44. In this case, National Union put forth affidavits explaining its failure to respond within 45 days. According to these affidavits, National Union has developed written procedures to handle lawsuits filed against it and its insureds. The Caspers' Complaint was served on National Union's authorized agent, and then received by Weisinger in New Jersey on May 11, 2006. Weisinger reviewed the Complaint and forwarded it on May 16 to Lanphear, a claims specialist in Atlanta, Georgia, who handled trucking liability accidents. It

288

was not until the Caspers moved for default judgment on June 20 that National Union became aware that the Complaint had never been received by Lanphear. National Union promptly filed a motion for enlargement of time on June 26, 2006.

¶ 45. The motion and supporting affidavits assert that the Complaint was inadvertently lost in the U.S. Mail between offices, despite the best efforts of Weisinger and National Union. Lanphear's failure to ensure that an answer was filed was due to his complete ignorance that a Complaint had been served. As this breakdown in communication was not the product of either Weisinger or Lanphear's actions, and occurred in spite of the established claim processing procedures, National Union argued that its failure to respond was the product of excusable neglect.

¶ 46. The circuit court agreed. In a July 27, 2006, hearing, Judge Foley cited Weisinger and Lanphear's affidavits as evidence to support excusable neglect in the failure to timely answer and "good faith and prompt efforts to rectify the oversight when it was discovered." He noted that National Union has a process in place to assure timely answers, but "it appears that correspondence was lost." Referencing the standard set forth in *Sentry Insurance Co. v. Royal Insurance Co. of America,* 196 Wis. 2d 907, 539 N.W.2d 911 (Ct. App. 1995), Judge Foley found that National Union's conduct constituted excusable neglect.

¶ 47. At the court of appeals, the Caspers argued that "lost in the mail" cannot constitute excusable neglect as a matter of law. The court of appeals rejected this argument, and we agree. We cannot reject out-of-hand the possibility that a packet was actually "lost in the mail," although courts should be skeptical of glib

claims that attribute fault to the United States Postal Service. Here, the affidavits from Weisinger and Lanphear show that these individuals acted in normal fashion and that their established routine worked previously to provide timely answers to the plaintiffs in this case. When an entity is processing thousands of complaints, a few inadvertent mishaps are bound to occur. Courts should carefully scrutinize what steps an organization has taken to avoid such mishaps, how quickly the organization responds when it discovers its delinquency, and whether its delay has caused prejudice to the plaintiffs. The circuit court here considered these factors, and the Caspers have not shown that the circuit court erroneously exercised its discretion after considering all the circumstances involved.

¶ 48. Our precedent has set "an extremely high bar to reverse excusable neglect determinations." *Phelps v. Physicians Ins. Co. of Wis.*, 2005 WI 85, ¶ 72, 282 Wis. 2d 69, 698 N.W.2d 643 (Prosser, J., concurring in part, dissenting in part) (reversed and remanded on other grounds *by Phelps v. Physicians Ins. Co. of Wis.*, 2009 WI 74, 319 Wis. 2d 1, 768 N.W.2d 615). As in *Meier*, the circuit court applied the proper standard and appropriately considered both the law's disfavor of default judgments and the lack of prejudice to the Caspers. The Caspers have failed to meet the high bar required for reversal.

¶ 49. Accordingly, upon review of the circuit court's order, together with the affidavits submitted and the surrounding circumstances, we conclude that the circuit court did not erroneously exercise its discretion in granting National Union's motion to enlarge time.

## B. Direct Action Under
## Wis. Stat. §§ 632.24 and 631.01

¶ 50. The second issue requires us to interpret multiple statutes related to insurance. Statutory interpretation begins with the language of the statute. *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. "If the meaning of the statute is plain, we ordinarily stop the inquiry." *Seider v. O'Connell*, 2000 WI 76, ¶ 43, 236 Wis. 2d 211, 612 N.W.2d 659. Statutory language is given its common, ordinary, and accepted meaning, except for technical or specifically defined words or phrases. *Kalal*, 271 Wis. 2d 633, ¶ 45. We interpret statutory language in context—that is, "as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.*, ¶ 46 (citing cases).

¶ 51. Chapter 631 of the Wisconsin Statutes is entitled "INSURANCE CONTRACTS GENERALLY." Chapter 632 is entitled "INSURANCE CONTRACTS IN SPECIFIC LINES."

¶ 52. Wisconsin Stat. § 632.24 relates to "Direct action against insurer." It reads:

> Any bond or policy of insurance covering liability to others for negligence makes the insurer liable, up to the amounts stated in the bond or policy, to the persons entitled to recover against the insured for the death of any person or for injury to persons or property, irrespective of whether the liability is presently established or is contingent and to become fixed or certain by final judgment against the insured.

¶ 53. The wording of this provision is broad enough to cover insurance policies delivered or issued

291

for delivery in this state and insurance policies delivered or issued for delivery outside this state. The words "Any . . . policy of insurance covering liability to others" make the statute exceptionally inclusive.

¶ 54. National Union argues, however, that § 632.24 is governed and limited by the first section of ch. 631, namely, Wis. Stat. § 631.01(1), which reads in part:

> Application of statutes. (1) General. This chapter and ch. 632 apply to all insurance policies and group certificates delivered or issued for delivery in this state, on property ordinarily located in this state, on persons residing in this state when the policy or group certificate is issued, or on business operations in this state, except:
>
> . . . .
>
> (c) As otherwise provided in the statutes.

Wis. Stat. § 631.01(1).

¶ 55. National Union argues that Wis. Stat. § 631.01(1) covers only those policies delivered or issued for delivery in this state *and* issued (a) on property ordinarily located in this state, (b) on persons residing in this state when the policy or group certificate is issued, or (c) on business operations in this state. In other words, National Union argues that delivery or issuance for delivery in this state is a threshold prerequisite under the statute, and because its policy was not delivered or issued for delivery to TLC in Wisconsin, it is not subject to direct action under § 632.24.

¶ 56. National Union relies on *Kenison.* In *Kenison,* the plaintiff brought suit against the Canadian insurer of a Canadian corporation whose employee was driving a car from one Canadian location to another.

*Kenison,* 218 Wis. 2d at 702–03. The insurer argued that it could not be subject to a direct action under § 632.24 because the insurance policy had not been delivered or issued for delivery in Wisconsin. *Id.* at 703–04. The court of appeals concluded, "the unambiguous language of § 631.01, Stats., limits the application of § 632.24, Stats., to insurance policies delivered or issued for delivery in this state." *Id.* at 710.

¶ 57. Both the circuit court and the court of appeals determined that *Kenison* was controlling in this case.[4] However, the Caspers interpret § 631.01(1) differently and offer a grammatical construction of the statute not considered in *Kenison.*

¶ 58. The Caspers urge a disjunctive reading with four parallel, alternative clauses. They contend that the "or" before the final clause makes clear that the clauses should be read in the alternative, or disjunctive. In other words, the Caspers ask us to read the statute as follows:

This chapter and ch. 632 apply to all insurance policies and group certificates:

(1) delivered or issued for delivery in this state, *or*

(2) on property ordinarily located in this state, *or*

(3) on persons residing in this state when the policy or group certificate is issued, *or*

(4) on business operations in this state.

---

[4] As the court of appeals correctly noted, it was without authority to modify, withdraw, or otherwise change the holding in *Kenison* even if it wanted to. *Casper,* 323 Wis. 2d 80, ¶ 28. "[O]nly the supreme court, the highest court in the state, has the power to overrule, modify or withdraw language from a published opinion of the court of appeals." *Cook v. Cook,* 208 Wis. 2d 166, 189–90, 560 N.W.2d 246 (1997).

¶ 59. Under the Caspers' construction of the statute, direct action would be appropriate where *any* of these four conditions is met. *See V.D.H. v. Circuit Court for Ozaukee Cnty.*, 154 Wis. 2d 576, 591 n.5, 453 N.W.2d 882 (1990) ("When a statute contains a list of conditions, the 'or' between the final subsections of the statutory list is to be read as a disjunctive."). To read the statute as advanced by National Union, they argue, would do violence to the statutory language and render the clauses offset by commas superfluous.

¶ 60. Before evaluating these interpretations of the statute, we think it is useful to examine the history of direct action in Wisconsin.

¶ 61. One of Wisconsin's direct action statutes dates back to 1925. Wisconsin Stat. § 632.24 has its origin in ch. 341, Laws of 1925. Chapter 341 created Wis. Stat. § 85.25 (1925), which read:

> Any bond or policy of insurance covering liability to others by reason of the operation of a motor vehicle shall be deemed and construed to contain the following conditions: *That the insurer shall be liable* to the persons entitled to recover for the death of any person, or for injury to person or property, caused by the negligent operation, maintenance, use, or defective construction of the vehicle described therein, such liability not to exceed the amount named in said bond or policy.

(Emphasis added.)

¶ 62. In the 1929 session, the legislature renumbered § 85.25 to § 85.93. § 2, ch. 454, Laws of 1929. In 1957 § 85.93 was renumbered as Wis. Stat. § 204.30(4). § 18, ch. 260, Laws of 1957. That renumbering made the direct action statute part of another important insurance provision passed in 1925. *See* ch. 372, Laws of 1925.[5]

---

[5] *See infra,* ¶ 71.

¶ 63. In 1931 the legislature created a parallel direct action statute. Ch. 375, Laws of 1931. The chapter amended an existing civil procedure statute, Wis. Stat. § 260.11 (1929), by adding the following language:

> In any action for damages caused by the negligent operation, management or control of a motor vehicle, *any insurer of motor vehicles,* which has an interest in the outcome of such controversy adverse to the plaintiff or any of the parties to such controversy, or which by its policy of insurance assumes or reserves the right to control the prosecution, defense or settlement of the claim or action of the plaintiff or any of the parties to such claim or action, or which by its policy agrees to prosecute or defend the action brought by the plaintiff or any of the parties to such action, or agrees to engage counsel to prosecute or defend said action, or agrees to pay the costs of such litigation, *is by this section made a proper party defendant* in any action brought by plaintiff on account of any claim against the insured.

(Emphasis added.)

¶ 64. After adoption of the 1931 amendment, Wis. Stat. § 204.30(4) and Wis. Stat. § 260.11(1) were consistently linked as Wisconsin's *two* direct action statutes.

¶ 65. In 1950 this court addressed the effect of the 1931 amendment to § 260.11 in an automobile accident case in which a deceased driver was covered by an insurance policy that was issued in Massachusetts. *Ritterbusch v. Sexmith,* 256 Wis. 507, 512, 41 N.W.2d 611 (1950). The court said:

> If a policy containing a no-action clause is written in Wisconsin[,] of course the condition repugnant to our statute is void, *Lang v. Baumann,* [213 Wis. 258, 251 N.W. 461 (1933)], but to say that the same thing automatically applies when the contract is entered into

295

elsewhere gives Wisconsin statutes an extraterritoriality which we consider cannot be sustained.

*Id.*

¶ 66. The court noted that no Wisconsin case had been cited which held that the obligation of an automobile liability policy is to be interpreted by any law other than the law of the state in which the contract was made. *Id.* at 515. The court added:

> The policy stands, then, as a contract made in Massachusetts whose obligations are established and to be construed by the effect which Massachusetts law gives them. It is conceded that in that state the no action clause is valid. This being so, it secured to the insurer a valuable contractual right and an application of sec. 260.11(1) of the Wisconsin statutes at the time of performance would impair that right and is thus forbidden by sec. 10, art. I, of the United States constitution.

*Id.*

¶ 67. In a 1957 law review article, University of Wisconsin law professor James B. MacDonald observed:

> The Wisconsin Supreme Court has consistently held . . . that in the absence of waiver, no right of direct action exists against an insurance company for an accident in Wisconsin if the policy contains a no-action clause and was issued in a state in which such a clause is legal.

James B. MacDonald, *Direct Action Against Liability Insurance Companies,* 1957 Wis. L. Rev. 612, 616.

¶ 68. MacDonald railed against this result, arguing that the United States Supreme Court's decision in *Watson v. Employers Liability Assurance Corp.,* 348 U.S. 66 (1954), eliminated constitutional concerns, *id.* at

621–22, and calling upon the Wisconsin legislature to "create a substantive right of direct action against liability insurers for all injuries within its boundaries without regard to where the policy was issued," *id.* at 623.

¶ 69. The legislature responded in 1959. Ch. 380, Laws of 1959. It amended Wis. Stat. § 260.11(1) by adding the following language:

> The right of direct action herein given against an insurer against liability for damages to persons other than the insured arising out of the negligent operation, management or control of a motor vehicle shall exist whether the policy of insurance sued upon was issued or delivered in the state of Wisconsin *or not* and whether or not the policy or contract of insurance contains a provision forbidding such direct action, provided the accident or injury occurred in the state of Wisconsin.

*Id.* (emphasis added).

¶ 70. This language was modified in 1967 to address the results in *Koss v. Hartford Accident & Indemnity Co.,* 231 F. Supp. 376 (W.D. Wis.), *aff'd* 341 F.2d 472 (7th Cir. 1965), and *Miller v. Wadkins,* 31 Wis. 2d 281, 142 N.W.2d 855 (1966), which eliminated direct actions against insurers when the accidents occurred outside Wisconsin, irrespective of where the policy was delivered or issued for delivery. The 1967 amendment eliminated the 1959 language and replaced it with the following: "If the policy of insurance was issued or delivered outside the state of Wisconsin, the insurer is by this section made a proper party defendant only if the accident or injury occurred in the state of Wisconsin." *See* § 2, ch. 14, Laws of 1967.

¶ 71. The 1967 language was proposed by the Legislative Council. Its note in the drafting file explains:

> The last sentence of 260.11(1) [1959] has been deleted and a new provision added to change the result in *Miller v. Wadkins*. The change makes it clear that the 1959 amendment relating to direct actions where the accident occurred outside Wisconsin was intended to apply to foreign issued contracts only. The new language should permit direct action where the policy is issued or delivered outside Wisconsin, if the accident occurs in the state.

Legislative Council drafter's note for Wis. Stat. § 260.11(1) (1967) (citations omitted).

¶ 72. The essential language in former § 260.11(1) is now located in Wis. Stat. § 803.04(2). The essential language in former Wis. Stat. § 204.30(4) is now located in Wis. Stat. § 632.24. Section 803.04(2) explicitly and § 632.24 by necessary implication are intended to apply to liability insurance policies delivered or issued for delivery outside Wisconsin, so long as the "accident, injury or negligence occurred in this state." Wis. Stat. § 803.04(2)(a). Of course, they apply to Wisconsin-issued policies as well.

¶ 73. The question then is whether Wis. Stat. § 631.01(1) somehow overrides these two statutes to make the delivery or issuance for delivery within the state a prerequisite of direct action. The answer is clearly "no." If we were to accept the Caspers' interpretation of § 631.01(1), it would be consistent with our reading of Wis. Stat. § 632.24 and Wis. Stat. § 803.04(2). Conversely, if we were to accept National Union's interpretation of the same language, it would not eliminate the exception in Wis. Stat. § 631.01(1)(c), namely, "As otherwise provided in the statutes." Direct action against an insurer is clearly "provided in the statutes" on the facts of this case, irrespective of where the insurance policy was delivered or issued for delivery.

¶ 74. As noted above, several important changes in insurance law were made in 1925. § 2, ch. 372, Laws of 1925 created Wis. Stat. § 204.30 (1925). Subsection (1) of the new statute read:

> *No policy of insurance against loss or damage* resulting from accident to or injury suffered by an employe or other person and for which the person insured is liable, or against loss or damage to property caused by animals or by any vehicle drawn, propelled or operated by any motive power, and for which loss or damage the person insured is liable, shall be *issued or delivered in this state,* by any corporation or other insurer authorized to do business in this state, unless there shall be contained within such policy a provision that the insolvency or bankruptcy of the person insured shall not release the insurance carrier from the payment of damages for injury sustained or loss occasioned during the life of such policy, and stating that in case execution against the insured is returned unsatisfied in an action brought by the injured person, or his or her personal representative in case death results from the accident, because of such insolvency or bankruptcy, then an action may be maintained by the injured person, or his or her personal representatives against such corporation under the terms of the policy for the amount of the judgment in the said action not exceeding the amount of the policy.

(Emphasis added.)

¶ 75. Over time, this provision was renumbered and reformulated. It is now contained in Wis. Stat. § 632.22 and reads:

> Required provisions of liability insurance policies. Every liability insurance policy shall provide that the bankruptcy or insolvency of the insured shall not diminish any liability of the insurer to 3rd parties and

299

that if execution against the insured is returned unsatisfied, an action may be maintained against the insurer to the extent that the liability is covered by the policy.

¶ 76. What is notable is that the new section begins with the words "Every liability insurance policy" and eliminates the language "issued or delivered in this state" that was in the former statute. The Legislative Council Note to § 632.22 in ch. 375, Laws of 1975, reads: "This section covers s. 204.30(1), slightly enlarged to cover all property damage liability insurance, and much edited."

¶ 77. We think this section, like § 632.24, applies to insurance policies delivered or issued for delivery outside Wisconsin when the claim occurs in Wisconsin. Thus, § 632.22 would be another exception to Wis. Stat. § 631.01(1) if we agreed with National Union's interpretation of § 631.01(1).

¶ 78. Accepting National Union's interpretation of § 631.01(1) would require the court to reject the Caspers' grammatical interpretation of subsection (1), explain away the language in the Legislative Council's Note to the section,[6] and shoehorn statutes like § 632.24 into the innocuous exception in paragraph (c) of the subsection. On the other hand, accepting the Caspers' interpretation would have very broad implications for insurance policies that were *not* delivered or issued for delivery in Wisconsin—implications that go well beyond the issue of direct action.

¶ 79. Our ultimate determination of the meaning and scope of § 631.01(1) will fundamentally change the nature of the statutes that qualify as exceptions. Depending on our interpretation of the subsection, the

---

[6] "Sub. (1) applies to contracts *used* in this state." Wis. Stat. § 631.01(1) (emphasis added).

permitted exceptions will either be more expansive or more limited than the provision in the front of the subsection. We are not prepared to evaluate all the ramifications of such a determination.

■■■

¶ 80. Consequently, we hold only that Wis. Stat. § 632.24 applies to any policy of insurance covering liability, irrespective of whether that policy was delivered or issued for delivery in Wisconsin, so long as the accident or injury occurs in this state.[7] Accordingly, the decision in *Kenison* is overruled. On the second issue regarding direct action, the decision of the court of appeals is reversed.

### C. Personal Liability of Corporate Officers

¶ 81. The Caspers brought suit against Wenham for alleged negligence in approving the route driven by Wearing on the date of the accident—a route, they assert, that could not have been completed within federal safety requirements and was therefore illegal. The claim is against Wenham as an individual who was allegedly negligent in the performance of his duties in his capacity as a corporate officer of Bestway. Wenham asks us to hold that, as a matter of law, he cannot be held liable.

¶ 82. The Caspers quote the following statement in their brief: "It is the general rule that an individual is personally liable for all torts the individual committed, notwithstanding the person may have acted as an agent or under directions of another. This rule applies to torts committed by those acting in their official capacities as officers or agents of a corporation." 3A William Meade

---

[7] Wis. Stat. § 632.24 has the same reach as § 803.04(2).

Fletcher, *Fletcher Cyclopedia of the Law of Corporations,* ch. 11, § 1135 (2011).

¶ 83. *Fletcher* is a widely recognized treatise on corporations. An earlier version of the treatise was cited in 1979 in *Oxmans',* 86 Wis. 2d at 692–93, to support the proposition that "[a]n individual is personally responsible for his own tortious conduct."[8]

¶ 84. These propositions are readily understandable in situations involving intentional torts such as fraudulent misrepresentation, or situations like driving an automobile where a corporate officer's personal negligence would be treated the same as any other driver's. *Id.,* at 693. These propositions are not so clear, however, when a plaintiff seeks to hold a corporate officer liable for his negligence in making an executive decision involving business.

¶ 85. *Oxmans'* presented one side of this dilemma. In *Oxmans',* the plaintiff meat company brought suit against Blacketer Restaurant Associates, Inc., and James Blacketer, an officer of the corporation, for more than $50,000 in unpaid meat delivered to Blacketer's restaurants. *Id.* at 686, 690. The lawsuit arose from a meeting between Oxmans' and Blacketer, at which

---

[8] *See also* 1–6 *Matthew Bender & Co.,* Liability of Corporate Officers and Directors § 6.07 (2010) ("A director or officer must participate in the tort in order to be liable therefor. The liability arises from one's conduct, not one's status as a director or officer."); W.A. Harrington, Annotation, *Personal Civil Liability of Officer or Director of Corporation for Negligence of Subordinate Corporate Employee Causing Personal Injury or Death of Third Person,* 90 A.L.R. 3d 916 (1980) ("An officer . . . is not, merely as a result of his standing as such, personally liable for torts of corporate employees; to incur responsibility he must ordinarily be shown to have in some way participated in or directed the tortious act.").

Oxmans' presented a proposed schedule for payment of the Blacketer corporation's debt, and asked Blacketer to personally guarantee the outstanding account debt. *Id.* at 690. Blacketer told Oxmans' that he was willing to sign the guarantee, but that such an action was unnecessary because he personally, not the corporation, was a general partner, and he, Blacketer, was personally liable for the debt to Oxmans'. *Id.* It was later determined that the insolvent corporate defendant, not Blacketer personally, was the general partner in the restaurants.[9] *Id.*

¶ 86. The court held that Blacketer could be held personally liable for the tort of fraudulent misrepresentation based on the statements he made to Oxmans'. *Id.* at 692. Although the court's analysis focused on Blacketer's challenge to personal jurisdiction, it addressed the question of personal liability directly:

> A corporate agent cannot shield himself from personal liability for a tort he personally commits or participates in by hiding behind the corporate entity; if he is shown to have been acting for the corporation, the corporation also may be liable, but the individual is not thereby relieved of his own responsibility.

*Id.*

¶ 87. In an employment context, the court considered the liability of an employee driver where the liability of the state or municipal vehicle owner was

---

[9] Wenham argues that because Bestway is a solvent corporate defendant, this court's holding in *Oxmans' Erwin Meat Co. v. Blacketer*, 86 Wis. 2d 683, 273 N.W.2d 285 (1979), is distinguishable. While it may be true that Wenham, unlike Blacketer, is not trying to "hide behind" an insolvent corporate defendant, the solvency of a corporation alone is not determinative of whether a corporate officer may be held personally liable.

precluded by statute. *Shannon v. City of Milwaukee*, 94 Wis. 2d 364, 289 N.W.2d 564 (1980). The city's insurer, Continental Casualty Co., argued that the employee driver could not be sued because the action against the city as his employer was barred. *Id.* at 369. The court disagreed on the basis of the fundamental idea that the employee driver could be liable by virtue of his own alleged negligence. *Id.* The *Shannon* court further explained:

> Under the doctrine of *respondeat superior* an employer can be held vicariously liable for the negligent acts of his employees while they are acting within the scope of their employment. The additional liability of the employer, however, does not shield the negligent employee from his own personal liability, nor does it supplant his liability with that of his employer. It provides only an alternative, and in some cases a more lucrative, source from which the injured party may recover his damages.

*Id.* at 370 (citing *Oxmans'*, 86 Wis. 2d at 692).

¶ 88. In the instant case, we are not asked to reconsider either of these holdings. Indeed, Wenham clearly states that he "does *not* contend that *Oxmans'* stands for the proposition that a corporate officer can *never* be held personally liable for non-intentional conduct."

¶ 89. Instead, Wenham distinguishes *Oxmans'* on the basis that the court was faced with an intentional tort committed by a corporate officer. In this case, the Caspers do not allege any intentional tort; they allege negligence. Wenham argues that the court of appeals erred in extending *Oxmans'* to this situation. He also argues that the case law does not support personal liability for a non-intentional tort where the corporate officer of a solvent and insured company was acting in the scope of his duties.

304

¶ 90. Wenham contends that, if the court of appeals' decision to allow personal liability for negligence is allowed to stand, "every CEO and officer of a trucking company can now be subjected to personal liability for every vehicular accident based upon virtually any negligence theory of liability." We find this fear to be overstated. Accordingly, we decline to hold that corporate officers may never be held personally liable for negligent acts committed in the scope of their corporate duties.

¶ 91. In the alternative, Wenham argues that even if corporate officers may be liable for non-intentional torts committed in the course of performing their job, public policy considerations should preclude liability in this case. In this respect, we agree.

¶ 92. As a general rule, negligence is a question for the fact-finder, and is therefore unsuited to motions for summary judgment. *Lambrecht v. Estate of Kaczmarczyk,* 2001 WI 25, ¶ 2, 241 Wis. 2d 804, 623 N.W.2d 751. Nevertheless, a court may determine that public policy precludes liability even where the plaintiff has proved the elements of negligence. *Gritzner,* 235 Wis. 2d 781, ¶ 26. Accordingly, "when the facts are not complex and the relevant public policy questions have been fully presented, this court may determine whether public policy precludes liability before trial." *Id.,* ¶ 26.

¶ 93. In this case, the Complaint states a claim for relief and an answer was filed. The facts relevant to Wenham's alleged negligence are not particularly complex; indeed, some facts were conceded for the purpose of Wenham's summary judgment motion. Depositions were taken of Wenham, Wearing, Hofmann, and Marion, as well as Robert Coulter, a safety expert hired by the

Caspers. We therefore conclude that the facts of record are sufficiently developed to allow the court to proceed to a public policy analysis. *See Butler v. Advanced Drainage Sys.*, 2006 WI 102, ¶ 21, 294 Wis. 2d 397, 717 N.W.2d 760. In doing so, "we assume there is negligence and that the negligence was a cause of the injury, but for reasons of public policy, we prevent the claim from proceeding." *Cole v. Hubanks*, 2004 WI 74, ¶ 7, 272 Wis. 2d 539, 681 N.W.2d 147.

¶ 94. Traditionally, the court has identified six public policy factors that may operate to preclude liability:

> (1) the injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tortfeasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden on the negligent tortfeasor; or (5) because allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance for recovery would enter a field that has no sensible or just stopping point.

*Id.*, ¶ 8.

¶ 95. A court may find that liability is precluded on the basis of any one of these factors. *Smaxwell v. Bayard*, 2004 WI 101, ¶ 41, 274 Wis. 2d 278, 682 N.W.2d 923. Wenham argues the first, second, fourth, and sixth factors to this court. It is the first factor in particular—that the injury is too remote from the negligence—that we find compelling in this case.

¶ 96. Wenham did not hire Wearing. He did not train Wearing. He did not supervise Wearing. In fact, he never met the man driving the truck that collided with

the Caspers' vehicle that day in May. Any negligence on Wenham's part was remote from the Caspers' injury in terms of time, distance, and cause.

¶ 97. The route that Wenham allegedly approved was designed at least a year and a half prior to the accident. In *Rockweit v. Senecal,* 197 Wis. 2d 409, 427–28, 541 N.W.2d 742, we held that the injury of a child who fell in a fire pit was too remote from the alleged negligence of the defendant in choosing not to extinguish the embers the previous night. We concluded as a matter of law "that the injury . . . suffered several hours later outside [the defendant's] presence is too remote from any alleged negligence on her part to impose liability." *Id.* at 428.

¶ 98. Here, the injury suffered by the Caspers is similarly too remote from any alleged negligence Wearing may have committed one-and-a-half years prior to the accident.

¶ 99. Wenham's alleged negligence was not only remote in time, but also remote in space. Bestway was incorporated in Georgia, and its operating headquarters is located in Georgia. Wenham's office is located in Ohio. Wearing's route, however, originated in Milwaukee, traveled through Indiana and Illinois, and ended in Milwaukee. At no time did the route take Wearing through Ohio or Georgia. Moreover, the accident itself took place in Wisconsin. Any negligence on Wenham's part in approving a route, from his office in Ohio, to be driven entirely in other states, is simply too far removed from the injury the Caspers suffered in Wisconsin.[10] We note that negligence attributable to acts

_____

[10] *Oxmans',* 86 Wis. 2d at 692, stressed the fact that Blacketer's misrepresentation to Oxmans' "is alleged to have been made . . . while he was physically present in the state."

outside Wisconsin would raise issues involving conflict of laws.

¶ 100. Finally, and most significant, Wearing was under the influence of at least three prescription medications at the time of the accident. The investigating officer's report notes, "Wearing was under the influence of these drugs to such a degree as to render him incapable of safely operating the motor vehicle he was driving at the time of the crash," in violation of Wis. Stat. § 346.63(2)(a)1. There is no allegation that Wenham was ever aware of Wearing's prescription drug use, or any evidence that Wearing's use of prescription pain killers was related to the allegedly illegal route he was driving. Furthermore, while the investigating officer's report mentions two violations found in Wearing's logbook, "these were both from May 8, 2003 and probably did not have an effect on this crash." Wearing's drug use raises significant questions of foreseeability for Wenham.

¶ 101. Amici Wisconsin Insurance Alliance and Wisconsin Civil Justice Council direct us to the business judgment rule as support for the proposition that corporate officers cannot be held liable in negligence for acts in the scope or course of their official duties. In *Einhorn v. Culea*, 2000 WI 65, ¶ 19, 235 Wis. 2d 646, 612 N.W.2d 78, the court described the business judgment rule as "a judicially created doctrine that limits judicial review of corporate decision-making when corporate directors make business decisions on an informed basis, in good faith and in the honest belief that the action taken is in the best interests of the company." The business judgment rule is now reflected in part in Wis. Stat. § 180.0826:

> Unless the director or officer has knowledge that makes reliance unwarranted, a director or officer, in

discharging his or her duties to the corporation, may rely on information, opinions, reports or statements, valuation reports any of which may be written or oral, formal or informal, including financial statements, valuation reports and other financial data, if prepared or presented by . . . [a]n officer or employee of the corporation whom the director or officer believes in good faith to be reliable and competent in the matters presented.

¶ 102. However, the business judgment rule, as expressed in *Einhorn* and in Wis. Stat. § 180.0826, defines a corporate officer's duties to a company's shareholders, not to third parties. Thus, the business judgment rule does not necessarily immunize a corporate executive from liability for negligence. Nonetheless, the very existence of a business judgment rule reflects public policy that corporate officers are allowed *some* latitude to make wrong decisions without subjecting themselves to personal liability.[11]

¶ 103. This court has noted that "public policy is inexorably tied to legal cause in Wisconsin." *Fandrey v. Am. Family Mut. Ins. Co.,* 2004 WI 62, ¶ 15, 272 Wis. 2d 46, 680 N.W.2d 345 (internal quotations omitted). The purpose of the public policy factors is to allow the court to step in to block liability, even though the negligence is a cause of the injury. *Id.* Applying these well-established principles, we conclude that, even if Wenham's approval of Wearing's route was a cause of the accident, "the results are so unusual, remote, or unexpected that, in justice, liability ought not be imposed." *Koback v. Crook,* 123 Wis. 2d 259, 273, 366 N.W.2d 857 (1985) (superseded by statute on other grounds, as stated in *Nichols v. Progressive Northern Insurance Co.,* 2008 WI 20, ¶ 9 n.5, 308 Wis. 2d 17, 746 N.W.2d 220).

---

[11] *See also* Wis. Stat. § 181.0855(1).

¶ 104. In sum, even if Wenham approved the route driven by Wearing and even if such approval was negligent in light of federal safety regulations, the Caspers' injury is simply too remote to make him personally liable as an individual.

## V. CONCLUSION

¶ 105. In light of the foregoing, we conclude that the circuit court did not erroneously exercise its discretion in finding excusable neglect and granting National Union's motion to enlarge time. Likewise, the circuit court did not erroneously exercise its discretion by denying the Caspers' motion for default judgment. We further hold that a policy need not be delivered or issued for delivery in this state in order to subject the insurer to a direct action under Wis. Stat. §§ 632.24 and 803.04(2). Accordingly, we overrule *Kenison v. Wellington Ins. Co.* Finally, we hold that, while a corporate officer may be liable in some situations for non-intentional torts committed in the scope of his employment, in this instance Wenham's actions are too remote to provide a basis for personal liability.

*By the Court.*—The decision of the court of appeals is affirmed in part and reversed in part and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶ 106. ANN WALSH BRADLEY, J. (*concurring in part, dissenting in part*). I agree with the majority that the circuit court did not erroneously exercise its discretion when it enlarged the time for National Union to file an answer. I further agree with the majority's determination that the plaintiffs may maintain a direct action claim against National Union under Wis. Stat.

§ 632.24. Finally, I agree with the majority that Wenham, a corporate officer, may be held personally liable for negligent acts committed within the scope of his corporate duties.[1]

¶ 107. I part ways with the majority, however, when it applies public policy considerations to preclude liability against Wenham at this early stage in the circuit court proceedings. The majority's justification for remoteness based on time and distance is unsupportable in fact and in law. Further, I conclude that the facts are not sufficiently developed at this stage to determine whether Wenham's negligence was too remote from the cause of the accident to impose liability. Accordingly, I respectfully dissent.

I

¶ 108. In this case, the relevant allegation against Wenham is that he negligently approved a route that was both illegal and unsafe. It was illegal because it could not be completed within federal hours of service requirements, and it was unsafe because it permitted the driver no time to rest.

¶ 109. The implications of this case extend well beyond Wenham. The implications likewise extend be-

---

[1] *See, e.g., Lobato v. Pay Less Drug Stores,* 261 F.2d 406, 408–09 (10th Cir. 1958) ("It is the general rule that if an officer or agent of a corporation directs or participates actively in the commission of a tortious act or an act from which a tort necessarily follows or may reasonably be expected to follow, he is personally liable to a third person for injuries proximately resulting therefrom. But merely being an officer or agent of a corporation does not render one personally liable for a tortious act of the corporation."); *see also Escude Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d 902, 907 (1st Cir. 1980); *Wilson v. McLeod Oil Co.,* 398 S.E.2d 586 (N.C. 1990).

yond the plaintiffs, who sustained permanent and severe injuries in the accident. This case has implications for all of us who make use of the highways and byways of this state and assume that truck drivers are assigned routes that comply with federal safety regulations.

¶ 110. For the purposes of its public policy analysis, the majority assumes—as it must—that Wenham's approval of the illegal route was negligent.[2] Majority op., ¶ 93. It sets forth the general rule that negligence is a question for the fact finder. *Id.*, ¶ 92. It also recognizes an exception to the general rule: "when the facts are not complex and the relevant public policy questions have been fully presented, this court may determine whether public policy precludes liability before trial." *Id.* Relying on the fact that several depositions have been conducted,[3] the majority contends that the relevant facts of this case are "sufficiently developed" and "not particularly complex." *Id.*, ¶ 93. Ultimately, the majority concludes that, as a matter of public policy, this case should not be tried by a jury. *Id.*, ¶ 103.

¶ 111. The reason given by the majority is that Wehman's negligence is too remote in time, distance, and cause. *Id.*, ¶ 96. In particular, the majority relies on

---

[2] Although the majority asserts that it is assuming that Wenham was negligent and that his negligence was a cause of the injury, it undermines this assertion by referring to his "alleged" negligence and by minimizing the allegations against Wenham. It likewise undermines this assertion by questioning whether Wearing's drug use was foreseeable. The majority cannot have it both ways. It cannot assume negligence for the sake of applying the public policy factors, but then assert that the public policy factors limit liability because, in its assessment, it has questions about whether Wenham was negligent.

[3] It appears that the record does not contain complete copies of the depositions. Rather, it contains only excerpts.

the following facts: (1) the route Wenham approved was designed at least a year and a half prior to the accident, *id.,* ¶ 97; (2) Bestway is incorporated in Georgia and Wenham's office is in Ohio, whereas the accident occurred in Wisconsin, *id.,* ¶ 99; and (3) the driver of the truck was under the influence of prescription medications at the time of the accident, *id.,* ¶ 100.[4]

## II

¶ 112. This court has cautioned against taking liability determinations away from the jury by the application of public policy factors. We have stated that "cases in which a causally negligent tortfeasor is relieved of liability on judicial public policy grounds are infrequent and present unusual and extreme considerations." *Roehl Transp., Inc. v. Liberty Mut. Ins. Co.,* 2010 WI 49, ¶ 141, 325 Wis. 2d 56, 784 N.W.2d 542; *Butler v. Advanced Drainage Sys.,* 2006 WI 102, ¶ 19, 294 Wis. 2d 397, 717 N.W.2d 760. It is only when it would "shock the conscience of society to impose liability" that the court should intervene. *Pawlowski v. Am. Fam. Mut. Ins. Co.,* 2009 WI 105, ¶ 62, 322 Wis. 2d 21, 777 N.W.2d 67.

¶ 113. The majority's time-based justification for remoteness cannot be supported. Wisconsin statutes and case law recognize that a tortious act may cause an injury at some later date, and that the tortfeasor can be held liable for the non-immediate consequences of his

---

[4] The majority also asserts that Wenham never met or directly supervised Wearing, the driver of the truck. Majority op., ¶ 96. This assertion is a red herring. The relevant allegation here is that Wenham negligently approved the illegal and unsafe route that Wearing was driving, not that Wenham negligently trained or supervised Wearing.

actions—well beyond the year-and-a-half at issue here.[5] Additionally, Wisconsin has adopted what is known as the "discovery rule," under which the statute of limitations for tort claims begins to run on the date that the injured party discovers or should have discovered the injury. *Hansen v. A.H. Robins Co., Inc.,* 113 Wis. 2d 550, 335 N.W.2d 578 (1983). The discovery rule embodies Wisconsin's public policy—that a break in time between a negligent act and an injury need not preclude an injured plaintiff's recovery. The majority's determination that the year-and-a-half interval between the negligence and the injury renders Wenham's negligence too remote to permit liability is unsupportable in fact and law.

¶ 114. Similarly, the majority's contention that remoteness in space warrants application of the public policy factors to preclude liability is a non-starter. Bestway is engaged in a national business that sends drivers to many different states. Under those circumstances, Wenham can expect that his negligent approval of an illegal route may produce direct consequences in remote locations. I see no relevant distinction between an accident in Georgia (where Bestway is incorporated) or Ohio (where Wehman keeps an office) and the accident that did occur in Wisconsin, across several borders.

¶ 115. In this case, the real questions revolve around causation. The legal cause question is whether

---

[5] *See, e.g.,* Wis. Stat. § 893.89 (permitting a cause of action for injury resulting from improvement to real property when the injury occurs and the action commences within 10 years of the improvement); *Zielinski v. A.P. Green Indus. Inc.,* 2003 WI App 85, 263 Wis. 2d 294, 661 N.W.2d 491 (plaintiff was allowed to maintain a lawsuit alleging that exposure to asbestos in 1957–1963 resulted in a 1999 diagnosis of mesothelioma).

Wenham's negligent approval of an illegal route that was unsafe because it would not permit the driver an opportunity to rest was sufficiently remote from the accident that it would "shock the conscience of society to impose liability." *Pawlowski,* 322 Wis. 2d 21, ¶ 62. There also remain factual questions about causation. Such questions generally are "for the jury unless the facts are so clear that reasonable persons could not differ on the question." *Stewart v. Wulf,* 85 Wis. 2d 461, 469, 271 N.W.2d 79 (1978).

¶ 116. The majority foregoes factual development and short-circuits a jury determination. It appears to find that Wearing's use of prescription medication was the factual cause of the accident and that Wearing's use of prescription medication was unrelated to the illegal route he was driving. *See* majority op., ¶ 100. It implies that any violation of safety standards "probably did not have an effect on this crash." *Id.*

¶ 117. When I search the record and the depositions relied upon by the majority, I conclude that the facts are not so clear. Instead, I determine that many factual questions remain.

¶ 118. The majority bases its finding of fact that Wearing's use of prescription medication was the factual cause of the accident on a single sentence contained within an investigator's four-page report. *See id.* When I review the report, I conclude that it is significantly more ambiguous than the majority contends.

¶ 119. A blood sample was drawn from Wearing immediately after the accident, and it was later analyzed by an analyst at the Wisconsin State Crime Laboratory. The blood was found to contain Oxycodone, Diazepam, Nordiazepam, Caffeine, and Tocopheral (Vitamin E).

315

¶ 120. According to the investigator's report, the analyst said "she would not use the word 'impaired' in any testimony she would give" regarding the drug levels in Wearing's blood:

> [The analyst] told me that Diazepam and Nordiazepam are basically the same drug and can be considered as one when looking at the levels of it in the blood. [The analyst] said she would not use the word "impaired" in any testimony she would give regarding these blood levels. She said she would testify that these drugs are central nervous system depressants and at these levels in a person's blood would cause an increase in drowsiness and have a general sedating effect on the person. [The analyst] told me that the amount of Oxycodone in Wearing's blood was slightly above normal therapeutic levels, but she would need to know more about the amounts taken and the timeframe that they were taken in before making a more definitive statement about this. She said that the levels of Diazepam/Nordiazepam were slightly below normal therapeutic levels, but again provided the same caveat regarding the dosage and timeframe in which the drug was taken.

Ultimately, the investigator concluded that the accident "was caused by driver error on the part of Wearing."

¶ 121. It is likewise unclear from this record that Wearing's prescription drug use was unrelated to the illegal route. Wearing stated that he developed back pain in May of 2003, three years after he began driving routes for Bestway, and that he had been prescribed the three medications he was taking at the time of the accident for his pain.

¶ 122. In his deposition, Wearing explained that Bestway's routes required him to mark his unloading time as off-duty, a practice that violates federal safety regulations: "I would have to mark my unloading time as off duty because I would run out of hours." He stated

that he felt tired on the day of the accident and that he has felt tired on his overnight runs.

¶ 123. It may be that Wearing's fatigue and back pain stemmed from driving an illegal route that could not be completed within federal safety standards and was unsafe because it permitted Wearing no time to rest. It may be that Wenham's negligent approval of the illegal route directly contributed to the accident.

¶ 124. Once the facts are developed, reasonable minds may differ as to whether the plaintiffs' injuries are too remote from Wenham's negligence to impose liability. However, on this record, I determine that many factual questions remain. Because this case does not present "unusual and extreme circumstances" such that the application of public policy considerations is appropriate at this time, I would remand to the circuit court for trial.[6] Accordingly, I respectfully concur in part and dissent in part.

¶ 125. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this concurrence/dissent.

---

[6] I also conclude that the business judgment rule, cited by the majority at ¶ 101, is irrelevant to a public policy analysis. As the majority acknowledges, the business judgment rule circumscribes an officer's liability to the company's shareholders, not to third parties, and therefore does not immunize a corporate executive from liability for his negligence. *Id.,* ¶ 102.